[No. 3335-8-III.   Division Three.   June 26, 1980.]

THE STATE OF WASHINGTON, *Respondent*, v. HERMAN DONALD HARTZOG, *Appellant*.

*Wayne Lieb* of *Institutional Legal Services* and *Craig Davenport,* for appellant.

*Arthur R. Eggers, Prosecuting Attorney,* for respondent.

MUNSON, J.—Herman Hartzog appeals a conviction under RCW 69.50.401(c)[1] for possession of a controlled substance, an amphetamine. Hartzog was an inmate of the Washington State Penitentiary at the time he was found with the drug and at the time of trial.

On May 12, 1977, 7 months prior to Hartzog's trial, the Walla Walla Superior Court issued a general courtroom security order requiring certain security measures be taken with all penitentiary inmates appearing before the court. See Appendix I. Hartzog challenges the security order on the basis those measures, specifically probe searches prior to entry into the courtroom and shackling during trial, denied his right to due process and a fair and impartial trial.

We hold (1) the courtroom security order of the Superior Court for Walla Walla County must be applied only on an individualized basis, after a hearing from which the court determines and provides reasons for the implementation of each provision in the order; and (2) the crime of possession of a controlled substance (RCW 69.50.401(d)) does not require proof of intent or guilty knowledge.

We deem it necessary to supply background on the courtroom security order because the question of its broad applicability is before this court for the first time.

### HISTORY OF THE COURTROOM SECURITY ORDER

The penitentiary at Walla Walla is a maximum security prison where ordinarily the highest security–risk convicted felons are incarcerated. Many of the prisoners are repeat offenders serving longer sentences for more serious crimes than inmates of other penal institutions in the state. The

---

[1]The legislature amended RCW 69.50.401 by inserting a new section (c) and moving what was (c) to (d), but did not change the overall definition of the crime of possession of a controlled substance. In 1977, the statute read:

(c) It is unlawful for any person to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice, or except as otherwise authorized by this chapter.

To avoid confusion, we hereafter refer to this section as (d).

Walla Walla County Superior Court has jurisdiction over those cases which arise from felonies committed within the penitentiary.

The incidents which formed the basis for the Walla Walla Superior Court security order are recounted in both the record of a hearing held May 12, 1977, and the security order itself. During the closing stages of a trial held 2 months prior to the issuance of the order, a bomb made with a Bic lighter exploded in the conference room adjacent to the courtroom, severely injuring a penitentiary correctional officer. Prison officials later told the court an inmate witness had made the bomb and smuggled it into the courthouse. During that trial, an inmate witness threw water in the face of a juror; one of the defendants, Gilcrist, made an obscene gesture to the judge; and both defendants, Gilcrist and Agtuca, during the trial spilled coffee and milk on themselves and ripped their clothing, apparently in an attempt to disrupt or delay the proceedings. *See State v. Gilcrist,* 91 Wn.2d 603, 614, 590 P.2d 809 (1979). The Walla Walla courthouse has been the scene where inmates in shackles have destroyed books and thrown objects through walls; where one inmate has tried to choke another; and where an escaping prisoner was chased and fired upon by guards as he ran through the courthouse and onto a public street.

As a result of the Walla Walla Superior Court's experiences, combined with information and recommendations of prison and law enforcement officials, the court adopted these security measures to be required of all inmates who came to court. The basis of the order is found in the order itself:

> Psychiatric evaluation reports received by the Court, the testimony of inmates at hearings and trials, and the conduct of inmates both in and out of the courtroom evidence that many individuals are being brought into the courtroom who constitute an extreme danger to the public, jurors, court personnel, custodial staff and security staff. Heedless of the consequences of their actions, they are willing to murder or maim innocent people merely for

their morbid amusement, trial delays, mistrials or escape diversions.

. . .

While some of these inmates are predictable risks obviously requiring special precautions, the predictability comes from past experience. The prison setting itself can trigger violent action in an individual who has not exhibited it before. Therefore, this Court deems there is no way to reliably distinguish the violent from the nonviolent. All inmates are potentially dangerous.

Prior to trial, Hartzog moved to set aside the courtroom security order, specifically objecting to the required body cavity search before each courtroom appearance and to being shackled in arm and leg restraints throughout the trial. The trial court denied the motion. In his ruling the trial judge relied in part on the routine nature of the security measures. He also relied on an order issued by this court in State v. Snook, No. 2425–III, June 9, 1977, incorporated by reference into his oral ruling.

In Snook, this court denied the State's motion for discretionary review, finding no error in the Walla Walla Superior Court's courtroom security order as applied in that case. This court's denial of the State's motion was based primarily on the record which contained a diagnostic evaluation of Snook as "'an anti–social personality . . . with aggressive homicidal and suicidal trends,'" as well as the criminal history of the inmate witnesses scheduled to appear during his trial. In denying the State's motion, this court did not reach "the broad applicability of the order regarding courtroom security as it appears to apply to any inmate, defendant or witness brought into court from the Washington State Penitentiary."[2] *See also State v. Gilcrist, supra.*[3] Thus, the

---

[2]This matter could have been further reviewed on appeal, but subsequent to his conviction, Snook withdrew his appeal.

[3]In *State v. Gilcrist, supra,* the shackling of the defendant inmates Gilcrist and Agtuca was held not to violate their fair trial rights under the Walla Walla courtroom security order; however, the court noted that the order was not in the record, nor was it challenged by the defendants. Furthermore, as noted earlier in

courtroom security order itself, as applied to all penitentiary inmates, and specifically to Hartzog, is before this court for the first time.

After the trial court denied Hartzog's motion to set aside the order, Hartzog's counsel informed the court Hartzog and his witnesses would not submit to shackling and probe searches. He was therefore absent during his trial although his testimony and that of his witnesses was viewed by the jury on videotape.

## BODY CAVITY SEARCH

The courtroom security order provides:

> 1. Inmates will be searched at the prison before departure. They will be brought to the Walla Walla County Jail where they will be skin and probe searched under the supervision of the sheriff's personnel. As needed, they will be brought to the courtroom in the joint custody of the sheriff's personnel and penitentiary custodial staff.

According to an undisputed affidavit submitted by Hartzog, he was arraigned on October 27, 1977. Prior to his leaving the penitentiary, his clothes were taken from him and he was put in a jumpsuit. He was then shackled and transported approximately 3 miles to a room in the county courthouse. There, in the presence of the sheriff, a correctional officer, and a member of the penitentiary hospital staff, he was ordered to take off his jumpsuit. He then bent over a radiator and the hospital staff member probed Hartzog's rectum with his finger. He put his jumpsuit back on and was escorted to court.[4] Hartzog's affidavit also stated he would not appear personally in court to testify in his own behalf if he were ordered by the court to submit to a

---

this opinion, the record evidenced sufficient justification for the court's action in that case. *State v. Gilcrist, supra* at 613.

[4]After Hartzog's return from his arraignment, the hospital staff member who had searched him ridiculed him in the presence of four or five other prison inmates about the search. The allegation stands unrefuted. The trial court stated it was offended at such inexcusable conduct. We also find such conduct reprehensible and suggest it should have been subject to prison discipline.

rectal probe search each time he was required to appear at the Walla Walla courthouse.

On January 19, 1978, the court denied Hartzog's motion to set aside the courtroom security order. Hartzog then sought a temporary restraining order in federal district court. That court issued a temporary restraining order enjoining the Walla Walla Superior Court from conducting body cavity searches on Hartzog or any inmate witness who would be called to testify in his criminal trial, "except that such searches may be conducted upon an individualized showing of probable cause."

On January 25, 1978, the Walla Walla court held a probable cause hearing in compliance with the federal court's order on the probe search requirement. The prosecutor submitted to the court the criminal and institutional records of Hartzog and his two witnesses, Manuel Rosalez and Lanny Sargeant. See Appendix II. The prosecutor also introduced for "illustrative" purposes only a "keister cache," a metal device which can be inserted in the rectum and used both for carrying contraband and as a weapon.[5] There was no allegation such a device had been used by Hartzog or his witnesses.[6]

After the hearing, the trial judge held there was probable cause for the searches based upon the nature of the crimes for which Hartzog and his witnesses had been convicted and upon the records of the inmates while in prison. The

---

[5]The keister cache introduced as an exhibit here is a machine–tooled stainless steel cylinder approximately 4 inches long and 11/16 of an inch in diameter. One end of the cylinder can be unscrewed revealing a blade screwed into the remaining portion of the cylinder. This can then be removed from the inside of the cylinder and screwed into the other end. With the cap rescrewed, the result is a knife with a 3–inch blade and a 4–inch handle.

[6]The requirement of the courtroom security order that a probe search be conducted is based at least in part on the Bic lighter which exploded in the courthouse in March 1977. In the hearing preceding adoption of the order, the superintendent of the prison stated that he had been informed the lighter had been brought into the courtroom the day before in a keister cache. In finding there was probable cause to probe search Hartzog, the court referred to that incident and the means in which the bomb had been carried into the courthouse.

trial court relied exclusively upon *Daughtery v. Harris,* 476 F.2d 292 (10th Cir.), *cert. denied,* 414 U.S. 872, 38 L. Ed. 2d 91, 94 S. Ct. 112 (1973).

This record does not reflect whether these inmates were searched prior to arriving at the courthouse. The prevailing rule is that visual and body cavity searches, within the confines of a penal institution, are reasonable if performed by qualified personnel in a reasonable and nonabusive manner. *Bell v. Wolfish,* 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *Daughtery v. Harris, supra.*

In *Bell v. Wolfish, supra,* the court weighed the significant and legitimate security interests of convicted prisoners and pretrial detainees against the institutional consideration for prison security and held visual body searches were reasonable under the Fourth Amendment. The court noted, in determining the reasonableness of such searches, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish, supra* at 441 U.S. 559, 99 S. Ct. 1884. Although prisoners retain at least some degree of Fourth Amendment protection, the exigencies inherent in a prison environment require a balancing between the state's interest in order and security and the prisoner's rights to privacy and to be free from unreasonable searches and seizures.[7] If the above requirements are met, a search within the prison is therefore reasonable.[8]

The courtroom security order further requires a second search upon arrival at the Walla Walla County jail prior to an inmate being brought into court. Obviously, the second

---

[7]*Hurley v. Ward,* 584 F.2d 609 (2d Cir. 1978); *United States v. York,* 578 F.2d 1036 (5th Cir.), *cert. denied,* 439 U.S. 1005, 58 L. Ed. 2d 682, 99 S. Ct. 619 (1978); *United States v. Lilly,* 576 F.2d 1240 (5th Cir. 1978). *See also Bell v. Manson,* 427 F. Supp. 450 (D. Conn. 1976); *People v. Valenzuela,* 589 P.2d 71, 73 (Colo. App. 1978).

[8]We recognize that *Bell v. Wolfish, supra,* was decided while this case was on appeal and therefore the trial court did not have the benefit of the Supreme Court's decision.

search is an additional security measure. The necessity, however, for a second search is not set forth in this record. We note all of the above–cited cases are within a prison context. We can find no authority for a double search, *i.e.*, subjecting an inmate to a probe search at the prison, transporting the inmate to the courthouse, and there requiring another probe search before his entry into the courtroom.[9] Should a breach of security occur between the penitentiary and the arrival of the escorted inmate at the courthouse or thereafter, a hearing should be held to determine the likelihood of a breach of security resulting in the prisoner's obtaining a weapon, drugs or other contraband.[10]

Undeniably, the trial court has the duty to protect persons in the courtroom. *State v. Basford,* 1 Wn. App. 1044, 467 P.2d 352 (1970). This record does not disclose, however, whether a search was conducted at the prison prior to Hartzog's departure, nor whether a reasonable ground existed which made a second search at the courthouse necessary.

We find the requirement of a second search at the courthouse, based upon this record, is unreasonable. A hearing must be held and a record made where evidence is taken justifying a second search. As it presently exists, the order is too broad. Hartzog properly declined to submit to the

---

[9]The dissent assumes the security order does not authorize a probe search at the penitentiary. As we read the order, two searches are required: one at the penitentiary and one at the courthouse. The security order provides specifically for a probe search at the courthouse; as to the type of search at the penitentiary, the order is silent. Probe searches at a penitentiary are common. We cannot assume that the required search at the penitentiary would not be so interpreted. If the prison search is not a probe search, it should be. Such searches are reasonable under the fourth amendment to the United States Constitution as indicated in our opinion. No authority is cited for a probe search at the courthouse within 30 to 60 minutes after a prison search and while the prisoner has been in continued custody. To require a second probe search at the courthouse without a showing of justification or reason to believe a breach of security has occurred is unreasonable.

[10]If there is any reason to question the thoroughness of the search at the penitentiary, we suggest the sheriff might be present at the prison during the search and thereafter take charge of transporting the inmate to trial.

second search; his absence at trial was justified. The application of the order denied him his right to appear in person and defend the charges against him. Const. art. 1, § 22 (amendment 10).

PHYSICAL RESTRAINTS OF A DEFENDANT DURING TRIAL

The next portion of the security order states: "(2) Inmates will remain in arm and leg restraints."

Over three quarters of a century ago, in *State v. Williams,* 18 Wash. 47, 51, 50 P. 580 (1897), the court noted:

Section 22, art. 1, of our constitution, declares that, "In criminal prosecutions the accused shall have the right to appear and defend in person." The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, and unless some impelling necessity demands the restraint of a prisoner to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty.[11]

Other cases commenting on this subject are: *State v. Ollison,* 68 Wn.2d 65, 411 P.2d 419, *cert. denied,* 385 U.S. 874, 17 L. Ed. 2d 101, 87 S. Ct. 149 (1966); *State v. Sawyer,* 60 Wn.2d 83, 371 P.2d 932 (1962), *cert. denied,* 372 U.S. 919, 9 L. Ed. 2d 724, 83 S. Ct. 733 (1963); *State v. Maryott,* 6 Wn. App. 96, 492 P.2d 239 (1971).

Historically, physical restraints of a defendant at trial are permissible only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape. The use of physical restraints is an extreme measure which should be used only as a last resort. *Illinois v. Allen,* 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970); *Kennedy v. Cardwell,* 487 F.2d 101 (6th Cir. 1973), *cert. denied,* 416 U.S. 959, 40 L. Ed. 2d 310, 94 S. Ct. 1976 (1974). *Cf. Loux v. United States,* 389 F.2d 911 (9th

---

[11]The right to be free of restraints has long been recognized at common law; *State v. Williams, supra* at 49–50, cites as authority: "2 Hale's Pleas of the Crown, 219; 4 Blackstone Commentaries, 322; *Layer's Case,* 6 State Trials (4th ed. by Hargrave), 230, 231, 244, 245; *Waite's Case,* 1 Leach's Cases in Crown Law, 36"; *People v. Harrington,* 42 Cal. 165 (1871); *State v. Kring,* 64 Mo. 591 (1877).

Cir.), *cert. denied,* 393 U.S. 867, 21 L. Ed. 2d 135, 89 S. Ct. 151 (1968); *See* Krauskopf, *Physical Restraint of the Defendant in the Courtroom,* 15 St. Louis U.L.J. 351 (1971); *ABA Standards Relating to Trial by Jury,* Standard 4.1(c) (Approved Draft, 1968) and comments thereto.

Physical restraints are viewed with disfavor for the following reasons: (1) physical restraints create a prejudice against defendants as being dangerous and untrustworthy even under the surveillance of law enforcement officers; (2) physical restraints impede a defendant's mental faculties and thus materially abridge his right of defense as well as his privilege of testifying in his own behalf; (3) physical restraints materially interfere with his right to consult with counsel during trial; and (4) physical restraints detract from the dignity and decorum of the judicial process. *Kennedy v. Cardwell, supra.*[12] The rule concerning shackling applies equally to a criminal defendant who is a prison inmate, as denoted in many of the cases in footnote 11.

█ The trial judge must exercise discretion in determining the extent to which security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be "potentially dangerous" is a failure to exercise discretion. *People v. Duran,* 16 Cal. 3d 282, 545 P.2d 1322, 127 Cal. Rptr. 618, 90 A.L.R.3d 1 (1976), overruling three California appellate cases based on such a general policy. *See also Woodards v. Cardwell,* 430 F.2d 978 (6th Cir. 1970), *cert. denied,* 401 U.S. 911, 27 L. Ed. 2d 809, 91 S. Ct. 874

---

[12]*See also United States v. Theriault,* 531 F.2d 281 (5th Cir. 1976); *United States v. Samuel,* 431 F.2d 610 (4th Cir. 1970); *Woodards v. Cardwell,* 430 F.2d 978 (6th Cir. 1970), *cert. denied,* 401 U.S. 911, 27 L. Ed. 2d 809, 91 S. Ct. 874 (1971); *People v. Duran,* 16 Cal. 3d 282, 545 P.2d 1322, 127 Cal. Rptr. 618, 90 A.L.R.3d 1 (1976); *People v. Brown,* 45 Ill. App. 3d 24, 358 N.E.2d 1362 (1977); *In re Staley,* 40 Ill. App. 3d 528, 352 N.E.2d 3 (1976); *State v. Borman,* 529 S.W.2d 192 (Mo. App. 1975); *State v. Tolley,* 290 N.C. 349, 226 S.E.2d 353 (1976); *State v. Roberts,* 86 N.J. Super. 159, 206 A.2d 200 (1965); *Willocks v. State,* 546 S.W.2d 819 (Tenn. Crim. App. 1976).

(1971); *State v. Roberts,* 86 N.J. Super. 159, 206 A.2d 200 (1965); *Moore v. State,* 535 S.W.2d 357 (Tex. Crim. App. 1976). The activities of other persons, unrelated or not imputable to an accused, may not be used as a basis for shackling a criminal defendant. *Willocks v. State,* 546 S.W.2d 819, 821 (Tenn. Crim. App. 1976).

Here, the trial judge in addition to the policy incorporated in the security order, relied upon the fact that the jury was bound to learn Hartzog and his witnesses were prison inmates. Thus, the court reasoned if all inmates were brought into and remained in court in physical restraints, the jury would not be affected or prejudiced thereby. That argument has been rejected. *United States v. Samuel,* 431 F.2d 610, 615–16 (4th Cir. 1970), *cert. denied,* 401 U.S. 946, 28 L. Ed. 2d 229, 91 S. Ct. 964 (1971); *People v. Duran, supra* at 16 Cal. 3d 293, 545 P.2d 1329. At the pretrial hearing on the issue of physical restraint, there was no evidence of these particular inmates' propensities to escape or to create disorder.[13] A meaningful exercise of discretion requires the trial judge to make the decision to use physical restraints on a case–by–case basis. *People v. Condley,* 69 Cal. App. 3d 999, 138 Cal. Rptr. 515, *cert. denied,* 434 U.S. 988, 54 L. Ed. 2d 483, 98 S. Ct. 619 (1977); *State v. Roberts, supra* at 204.

The rule that the trial court have some reason stated in the record, based on the conduct of the prisoner, applies also to shackled witnesses brought into court from penal institutions. *State v. Coursolle,* 255 Minn. 384, 97 N.W.2d 472, 75 A.L.R.2d 755 (1959). A defendant has the right to have his witnesses appear free of shackles unless there is danger of an escape or injury to persons in the courtroom. *Kennedy v. Cardwell, supra* at 105 n.5; *State v. Williams, supra;* Annot., *Right of accused to have his witnesses free from handcuffs, manacles, shackles, or the like,* 75

---

[13]The record found in Appendix II was introduced at a subsequent hearing on the issue of body searches and thus was not before the court at the time it determined the shackling issue.

A.L.R.2d 762 (1961). The shackling of a witness can have a comparable prejudicial effect to that of shackling a defendant. *Commonwealth v. Brown,* 364 Mass. 471, 305 N.E.2d 830 (1973); *see also United States v. Esquer,* 459 F.2d 431 (7th Cir. 1972), *cert. denied,* 414 U.S. 1006, 38 L. Ed. 2d 243, 94 S. Ct. 366 (1973). Inasmuch as this matter is being remanded for a new trial, the court is not foreclosed from reconsidering this issue. We realize that while this case has been on appeal several disruptive incidents have occurred at the penitentiary. Whether the defendant and his witnesses were involved in those incidents is not known to this court.

*State v. Tolley,* 290 N.C. 349, 368, 226 S.E.2d 353 (1976), sets forth several factors which the trial court may consider, *inter alia,* in determining whether to use physical restraints on an inmate defendant or inmate witnesses:

[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self–destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

We recognize in appropriate circumstances additional security measures must be taken to provide for the safety of the public and those in attendance upon the courts of this state. Such security measures, including physical restraints, are within the inherent power and discretion of the trial judge. The necessity for those measures must be made on a case–by–case basis after a hearing with a record evidencing the reasons for the action taken. The standard for appellate review will be whether the trial court has abused its discretion. *Cf. State v. Watson,* 114 Ariz. 1, 559

P.2d 121 (1976), *cert. denied,* 430 U.S. 986, 52 L. Ed. 2d 382, 97 S. Ct. 1687 (1977) and 440 U.S. 924, 59 L. Ed. 2d 478, 99 S. Ct. 1254 (1979). In weighing the protection of persons in the courtroom and the rights of a defendant, the trial judge must choose from "a wide variety of possible choices all within the permissible areas of judicial discretion." *State v. Basford,* 1 Wn. App. 1044, 1050, 467 P.2d 352 (1970). For example, the relocation of the witness stand and the reasonable use of additional security personnel are proper precautions. Further, if restraints are found necessary, those persons shackled may be in place at the time the jury is brought into the courtroom and remain so until the jury leaves, so the physical restraints will make less impact. The court may also consider the use of metal detectors and other security devices. The court may take such measures on an individualized basis without the necessity of a general security order.

### SEPARATION FROM LEGAL COUNSEL

Paragraph 3 of the security order states:

> Defendants will not sit at the counsel table. Security officers will remain sufficiently close to defendants to control their actions. Confidential matters will be discussed with counsel either in the courthouse hallway or the County Jail, depending on the duration of the conference.

The separation of Hartzog from his counsel during trial occurred as a result of his refusal to submit to the search and shackling and was not based on the order itself. Thus, we decline to comment on separation of a defendant from his counsel except to suggest the court may wish to reexamine this provision in light of previous comments in this opinion, particularly the provision's effect as it relates to a denial of effective counsel. *See Geders v. United States,* 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330 (1976), and cases cited therein.

## POSSESSION

Because the following issue may arise on retrial, we address the question: Is intent or guilty knowledge an element of the crime of possession of a controlled substance? See footnote 1.

The sequence of events out of which the charge of possession of a controlled substance arose is basically as follows: On October 3, 1977, within the prison, correctional officers Hartford and Baladez found Hartzog and two other prison inmates in a room off the Confederated Indian Tribes clubroom. On a television set in the room the officers saw two spoons containing a milky substance, a couple of white paper packets and a tape sheath device. As Officer Hartford was searching Hartzog, a syringe fell out of the front of his pants. Expert testimony established the residue on the spoons and syringe was an amphetamine.

Hartzog testified at trial he thought the white substance was Valium, which at the time of its discovery was not a controlled substance.

The trial court refused to give the following proposed instruction:

> To convict the defendant of the crime of unlawful possession of a controlled substance, the State must prove to you beyond a reasonable doubt the following:
>
> One. That on or about the 3rd day of October, 1977, the defendant unlawfully possessed a controlled substance; and
>
> Two. That the act occurred in Walla Walla County, Washington.
>
> Three. That the defendant *intended to possess* the controlled substance.
>
> Four. That the defendant *knew the substance was a controlled substance.*
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

(Italics ours.) Hartzog also assigns error to the giving of instruction No. 3:

To convict the defendant of the crime of Unlawful Possession of a Controlled Substance, the State must prove to you beyond a reasonable doubt the following:

1. That on or about the 3rd day of October, 1977, the defendant unlawfully possessed a controlled substance; and

2. That the act occurred in Walla Walla County, Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Hartzog excepted to instruction No. 3 because it did not include the elements of knowledge and intent. He also argued the instruction should include the defense of unwitting possession, although no such instruction was proposed.

Hartzog was charged and tried under RCW 69.50.401(c), now (d), which stated in pertinent part: "It is unlawful for any person to possess a controlled substance". Neither the present nor prior statute, Laws of 1959, ch. 27, § 69.33.230, p. 207, contained language of intent. Historically, the courts in Washington have held that intent and guilty knowledge are not elements of the crime of mere possession of narcotics or of controlled substances. *State v. Boggs,* 57 Wn.2d 484, 358 P.2d 124 (1961); *State v. Henker,* 50 Wn.2d 809, 314 P.2d 645 (1957); *State v. Sainz,* 23 Wn. App. 532, 596 P.2d 1090 (1979); *State v. Singleton,* 9 Wn. App. 327, 511 P.2d 1396 (1973); *State v. Dodd,* 8 Wn. App. 269, 505 P.2d 830 (1973); *State v. Edwards,* 5 Wn. App. 852, 490 P.2d 1337 (1971).

We adhere to the principle enunciated in the above–cited cases and respectfully decline to adopt the rationale of *State v. Weaver,* 24 Wn. App. 83, 600 P.2d 598 (1979). Following the standard employed in *State v. Boyer,* 91 Wn.2d

342, 344, 588 P.2d 1151 (1979), we believe that "absent express legislative language to the contrary," and within "the context of this statute, its history and language," neither intent nor guilty knowledge is intrinsic to the definition of the crime itself. *State v. Sainz, supra.*

*State v. Weaver, supra,* reasoning by analogy from *State v. Boyer, supra; State v. Smith,* 17 Wn. App. 231, 562 P.2d 659 (1977), *review denied,* 89 Wn.2d 1022 (1978); and *State v. Hennings,* 3 Wn. App. 483, 475 P.2d 926 (1970), held the legislature did not intend to eliminate a general intent, usually denoted as "willful guilty knowledge," as a necessary element of the crime of possession of a controlled substance. *State v. Hennings, supra* at 489. Traditionally the distinction between crimes that require guilty knowledge and those that do not are analyzed as crimes mala in se and mala prohibita.[14] A crime which is malum in se is defined as an act which is "immoral or wrong in [itself], or naturally evil, such as murder, rape, arson, burglary and larceny, . . ." 22 C.J.S. *Criminal Law* § 8, at 19–20 (1961). This class of crime generally involves "moral turpitude." A crime which is malum prohibitum is one prohibited by statute because it infringes "on the rights of others, although no moral turpitude or dereliction may attach, . . ." 22 C.J.S. *Criminal Law* § 8, at 20 (1961). Generally, crimes mala prohibita do not involve moral turpitude.

In *State v. Hennings, supra* at 489, the court noted: "Without doubt, by contemporary community standards possession *and* sale of narcotics, unless authorized by law, is a crime which by its very nature involves 'moral turpitude.'" (Italics ours.) *Hennings* involved possession *and* sale, *i.e.,* trafficking. *Smith* and *Boyer* involved delivery.

---

[14]We are aware of the criticism that the distinction or classification of crimes as mala in se or mala prohibita is "manifestly nonscientific," bears little relationship to logic or reality, and may change with social mores. 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 26 (1957). Since the distinction, however, looms in significance in the analyses of past drug cases, we find it useful for our purposes.

■ The present case and *State v. Weaver, supra,* involve only possession. Significantly, the legislative scheme distinguishes between trafficking and mere possession by placing the crimes in two separate sections of the statute. RCW 69.50.401(a) makes it unlawful for any person to *manufacture, deliver,* or *possess with the intent* to manufacture or deliver a controlled substance. RCW 69.50.401(d) makes it unlawful for anyone merely to *possess* a controlled substance unless authorized. The contemporary community standard, acknowledged in *Hennings,* is reflected in the legislative distinctions in the statute. Persons who actively participate in the manufacture, delivery or sale of drugs are perceived by the community as engaging in more socially harmful conduct than those who merely possess. Crimes which are mala in se, such as delivery of a controlled substance, require guilty knowledge which has been defined as "an understanding of the identity of the product being delivered." *State v. Boyer, supra* at 344. Mere possession is malum prohibitum and does not require intent or guilty knowledge.

*Hennings* relied on *Morissette v. United States,* 342 U.S. 246, 250, 96 L. Ed. 288, 72 S. Ct. 240 (1952), for the proposition that without proof of willfulness or guilty knowledge, "guilt could be assessed for an innocent, unintentional or inadvertent act." *State v. Hennings, supra* at 490. *See State v. Smith, supra* at 234. *Morissette* involved a charge of criminal conversion of government property and did indeed discuss at length the requirement of intent in a criminal statute. The court, however, noted two earlier narcotics cases, *United States v. Behrman,* 258 U.S. 280, 288, 66 L. Ed. 619, 42 S. Ct. 303 (1922); and *United States v. Balint,* 258 U.S. 250–52, 66 L. Ed. 604, 42 S. Ct. 301 (1922), and the trend toward modification of the general rule at common law requiring scienter or guilty knowledge where the statutory definition did not include it. *Morissette v. United States, supra* at 342 U.S. 259, 72 S. Ct. 247. The court stated at 342 U.S. 260, 72 S. Ct. 248:

Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static.

*Morissette* acknowledged it is the responsibility of Congress to define crimes, not the judiciary, nor should the judiciary enlarge the reach of those enacted definitions. *Morissette* noted at 342 U.S. 263, 72 S. Ct. 250:

And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

In viewing the context and language of the statute, we find there was no legislative intent to require guilty knowledge as an element of mere possession. In the predecessor statute drafted from the uniform narcotic drug act, Laws of 1959, ch. 27, § 63.33.230, p. 207, the statute provided: "It shall be unlawful for any person to . . . possess, . . . any narcotic drug, except as authorized in this chapter." The present statute states: "It is unlawful for any person to possess a controlled substance . . ." Two en banc decisions interpreting the preceding statute held that mere possession was sufficient for conviction. *State v. Larkins*, 79 Wn.2d 392, 486 P.2d 95 (1971); and *State v. Walcott*, 72 Wn.2d 959, 435 P.2d 994, *cert. denied*, 393 U.S. 890, 21 L. Ed. 2d 169, 89 S. Ct. 211 (1968). This division has recently noted the distinction between mere possession not requiring guilty knowledge in *State v. Sainz, supra,* and delivery requiring guilty knowledge, *State v. McKeown*, 23 Wn. App. 582, 596 P.2d 1100 (1979).

Applying the above–quoted material from *Morissette* and the statutes, we believe it significant not only that possession and delivery are in two separate sections of the statute, but also that the legislature did not supply the term *"knowingly"* to the possession section. The omission of the term signifies an intent to eliminate guilty knowledge from possession, and we decline to supply it judicially. This position accords with our Supreme Court's interpretation of prior narcotics statutes which did not find specific intent or guilty knowledge an element of mere possession. *State v. Boggs, supra; State v. Henker, supra.*

We find no error in the trial court's denying Hartzog's proposed instruction which would have required the State to prove both intent to possess and knowledge that the substance possessed was a controlled substance. Such an instruction is erroneous. The court's instruction which required the State to prove unlawful possession of a controlled substance was sufficient. Hartzog did not propose an instruction on the defense of unwitting or lawful possession of the amphetamine.

Judgment reversed and remanded for a new trial.

ROE, J., concurs.

### APPENDIX I

#### ORDER RE COURTROOM SECURITY

The experiences of this Court together with information supplied to and recommendations made to it lead to the conclusion that major changes must be made forthwith in courtroom and courthouse security measures in cases emanating from the Washington State Penitentiary.

Psychiatric evaluation reports received by the court, the testimony of inmates at hearings and trials, and the conduct of inmates both in and out of the courtroom evidence that many individuals are being brought into the courtroom who constitute an extreme danger to the public, jurors, court personnel, custodial staff and security staff. Heedless of the consequences of their actions, they are willing to murder or maim innocent people merely for their morbid amusement, trial delays, mistrials or escape diversions.

In the last penitentiary trial March 29th through April 5th, State v. Agtuca and Gilcrist, at the morning recess of the second day Gilcrist "accidentally" spilled coffee on his clothing and refused to come to the courtroom without his being taken back to the penitentiary for a change of clothing. The guards were ordered to produce him in court immediately. At the noon recess, the Court was informed at 1:25 p.m. that both defendants had "accidentally" spilled milk on their clothing during lunch and refused to come to court without a change of clothing. They were ordered produced in court without delay. At one point in the trial, Gilcrist "accidentally" ripped his pants and there was a delay until another pair was brought down from the penitentiary. At another point in the trial out of the presence of the jury Gilcrist following an adverse ruling by the court gave the court "the finger" (the Rockefeller salute). At the next recess of the court following this incident the defendant Gilcrist wrote the Court a note of apology for his conduct, which is made a part of this record, and included a request for Aspirin and Digel. The requested medication was provided by the Court.

The first witness for the defense stepped down from the witness stand and asked the prosecutor for a cup of water. Provided with a small amount, he proceeded to throw it in the face of the number 10 juror because he didn't like the way the juror had been looking at him.

Before the defendants testified, the Court gave specific instructions to the correction officer in charge of security that the defendants were not to take the stand with pencils, pens or any articles on their persons. The defendant Agtuca took the stand and when asked to stand to exhibit a scar to the jury, the Court observed a comb and what appeared to be a blue pen (later confirmed) protruding from his right rear pocket.

Although all witnesses and defendants were presumably skin and probe searched before leaving the penitentiary, the Court has been informed by the prison administration that one of the witnesses made a bomb with a Bic lighter and had it on his person the day he testified. Finding no opportunity to use it, he passed it to one of the defendants who brought it to the courthouse the next day (last day) of the trial and left it on the floor of the conference room where prisoners are held during recesses to confer with their lawyers. While conducting a search of the room for contraband, a penitentiary correctional officer found the lighter on the floor, attempted to light it and suffered the loss of three fingers of his right hand in the resulting explosion.

A number of the witnesses in the Agtuca–Gilcrist trial as well as other penitentiary trials heard by this Court have testified they engage daily in the practice of the martial arts to keep physically fit and to improve their skills in the use of deadly force with or without weapons.

While some of these inmates are predictable risks obviously requiring special precautions, the predictability comes from past experience. The prison setting itself can trigger violent action in an individual who has

not exhibited it before. Therefore, this Court deems there is no way to reliably distinguish the violent from the nonviolent. All inmates are potentially dangerous.

The witness stand is 52 inches from the number seven juror's chair. Witnesses pass within 18 inches of all front row jurors in taking and departing the witness stand.

In my considered opinion, there is no way to adequately secure our existing courtroom facilities without taking the following measures for trials requiring the presence of penitentiary inmates:

1. Inmates will be searched at the prison before departure. They will be brought to the Walla Walla County Jail where they will be skin and probe searched under the supervision of the sheriff's personnel. As needed, they will be brought to the courtroom in the joint custody of the sheriff's personnel and penitentiary custodial staff.

2. Inmates will remain in arm and leg restraints.

3. Defendants will not sit at the counsel table. Security officers will remain sufficiently close to defendants to control their actions. Confidential matters will be discussed with counsel either in the courthouse hallway or the County Jail, depending on the duration of the conference.

4. The witness stand will be located near the left end of the counsel table and between that table and the rail enclosing the clerk and court reporter. It will face the jury box and will be approximately 20 feet from it. Security personnel will be located so as to maintain control of the witness from the time he enters the courtroom until he departs.

5. No witness will be allowed to leave the witness stand without the court's permission.

6. The court before impanelling the jury, unless defense counsel requests the court not to, will advise all jurors that the security measures taken in penitentiary trials are the joint product of the penitentiary administration, the sheriff and the Court; that they are utilized routinely and that no inference is to be drawn from the security measures taken that any particular inmate is a security risk since the same procedures apply to all inmates regardless of their conduct records in the institution. The Court believes that jurors who live in a community where a penal institution is located will be more likely to determine issues fairly and impartially if they can observe for themselves the courtroom is secure. The jurors will be made aware during the course of the trial that the witnesses are inmates. It will be no surprise to jurors in this community that these routine security measures are taken. Thus, there should be no prejudice to defendants.

Judge Mitchell is attending the National Trial Judges' College. This Order therefore applies, at this time, to Department I of this court only.

The foregoing provisions and requirements of this Order shall be effective immediately.

Done in open court this 12th day of May, 1977.

_____/s/ John Tuttle_____
Judge

## Appendix II

These institutional records were submitted to the trial court at the probable cause hearing required by the federal district court in relation to the probe search. The records include correctional officers' reports and summaries prepared by penitentiary officials.

Hartzog—Criminal Record
7/19/69    Escape from reformatory honor camp.
4/12/72    Burglary in the second degree.
6/1/72    2 counts of armed robbery, maximum 20 years; 7 1/2 mandatory for armed with a deadly weapon; and maximum life with 7 1/2 mandatory for armed with a deadly weapon. *See State v. Barr,* 9 Wn. App. 891, 515 P.2d 840 (1973); *State v. Boast,* 87 Wn.2d 447, 553 P.2d 1322 (1976).

His penitentiary record indicates numerous violations for which punishment was given, many of which his counsel referred to as "cell tags," *i.e.,* in multi–occupant cells, contraband and weapons found in a cell are attributed to all occupants.

Penitentiary Record of Infractions:
7/29/73    Possession of ammo (11 – .22 caliber rounds); narcotics paraphernalia, including sugar; carving knife (cell tag).
12/9/74    Possession of pills (on his person); pleaded guilty.
5/14/75    Possession of prison tools, contraband, *i.e.,* two sets of Munchake sticks and a hash pipe; pleaded guilty.
6/8/75    Possession of weapon (chako sticks), pruno (4 1/2 gallons), three hash pipes (cell tag?); found guilty; administrative appeal—disposition not shown.
8/6/75    Possession of drugs (not controlled substance), pruno; found guilty; defendant said he'd appeal—disposition not shown.
10/12/75    Possession of pruno (cell tag); found guilty; defendant stated he would appeal—no disposition.
10/26/75    Intoxicated; white powder (determined not controlled substance); found guilty.
6/24/76    Possession of three small balloons, one pipe wooden bowl, diagram of a handgun; pleaded guilty. Denied possession of one cigar can of drug paraphernalia, one wooden slingshot with bag of rocks, tobacco bag containing milksugar, 5 gallons of pruno (cell tag). Placed in segregation as threat to institution security—review 30 days. Reviewed—action indefinite.

10/4/76   Theft of one pound sugar from kitchen. Pleaded guilty to violating his contract recommended by the Administrative Segregation Committee.

11/19/76   Possession of pruno, one gallon—pleaded guilty.

4/6/77   "After encountering the above resident in the big yard with pruno on his breath Off. Hagen and myself went to 8 B 6 and found 2 *hot water bottles from the hospital with pruno residue* in them. One hot water bottle with Res. Finnegan's 216855 name on it also with pruno residue in it." "Resident stated he did not know about any of the stuff. Stated that Mr. Sampson of the hospital gave one of the bottles to him for his back." "Guilty: On the 603 & 658. Dismiss 655 & 555. 10 days seg. Recommend contract be reinstated. Committee feels resident was in fact drinking and in violation of contract, however, resident did not have any pruno in his possession nor did he steal the bottle."

The numbers referred to in this officer's report are subsections from WAC 275–88–030, which is entitled Serious Infractions.

8/4/77   "Res. entered Adm. wing with a card board box. When I asked him to show me what was in it he said it was personal. After informing him he was refusing a shakedown if he did not show me what was in the box he walked on down D–Tier saying he would show it to me later."

"Res. states there were indian beads and necklaces for the CIT Pow Wow they were getting ready to have. He states he did say to the officer that he would show the box to him at a later time, as the resident's [sic] were all up at the cage and he did not want to dump everything on the ground. Also these were all personel [sic] items."

"Guilty: 80 hours extra duty to Wing Sgt. Ramos."

12/12/77   (Two months after being charged in this case.) Possession of 2 1/2 gallons of pruno. "On a routine shakedown of 14 C Adm., I found a two and one half gallon container of pruno under Hartzog's bed with a light on it to heat it. It was perking. Also I found one half of a pipe (the bowl) with marijuana residue in it. Also a cap with a hole and two chicken bones drilled out, which smells like they were used as roach clips."

"Stated he got the plastic jug for coffee but got a little depressed. Stated he used the chicken bones for making necklesses [sic]. He stated he got the pipe out of the garbage can."

"Guilty: 2 days isolation to be served on week–ends and recommend he remain in SAM program."

WITNESS ROSALEZ, MANUEL DAVID—Criminal Record

6/22/72   Taking a motor vehicle without permission, Spokane; maximum 10 years.
Robbery while armed with deadly weapon, firearm, King County; 7 1/2 years mandatory.

10/10/75   Attempting escape while under sentence of felony by dressing as female, Walla Walla County. See 8/3/75 *infra*.

Washington State Reformatory

4/12/74   Possession of anything not authorized for retention or receipt. Defendant handed plastic bag to inmate outside of shower. Refusing to obey a lawful order of any staff member; commission of any general infraction as enumerated in WAC 275–88–025 to create a security risk to the orderly operation of the Institution. (Defendant felt harassed.) Guilty to all three charges. Appeal/disposition not in record.

6/3/74   Refusing to obey lawful order; interfering with a staff member in the performance of his duties; commission of any general infraction as enumerated in WAC 275–88–025. Guilty on all three charges. (Defendant felt harassed.)

8/9/74   Possession of narcotic paraphernalia kit, one homemade pipe; roll of twine. Pleaded guilty. Defendant stated can't adjust to institution—asks for transfer.

Washington State Penitentiary

8/3/75   "Attempted escape from Big Yard masquerading as a woman with outside accomplices," during Confederated Indian Tribes Pow–wow held in the Big Yard at WSP.

11/19/75   Possession of shank (homemade knife). Discovered in spot check skin search. Pleaded guilty. Considered security risk.

1/22/76   Skin searched after visit; went into bathroom, skin searched again; marijuana in a plastic bag in waistband; pleaded guilty.

No officer report, but exhibit indicates:

7/25/77   "Abus. lang to staff, Interfer. w/staff duty, Threat bodily harm."

10/12/77   "Interf w/staff duty, threat, tamp w/lock, abus lang to staff, refus [*sic*] order."

WITNESS SARGEANT, LANNY LEE—Criminal Record

12/21/72   Assault second degree; sentenced 10 years.

Washington State Penitentiary

10/5/73   Possession of contraband, Valium 10 mg., got from pill line some weeks before.

1/30/75 — Cell search—one gallon pruno; one eyedropper; one plastic tubing; one 300–watt lightbulb; three empty jugs that smelled like pruno; found guilty.

3/26/75 — Refused to submit to search; found guilty.

5/29/76. — Hit officer with pair of trousers; "Off. Edwards and myself got a hold of him again, and he bit me on the elbow." Smell of pruno on his breath. Guilty—30 days segregation.

8/1/76 — Interdepartment memo relates Sargeant incarcerated for one count of murder, one count assault, both committed while intoxicated. When drinking, Sargeant becomes serious threat to other residents. Sargeant admits sometimes becomes assaultive when drinking. Contract to be drawn up (nature of contract not shown if ever drawn).

This is the only document mentioning a murder conviction. The trial court should verify convictions before considering extreme security measures. At trial, Sargeant testified a second–degree murder charge against him had been dropped.

8/12/76 — Administrative segregation hearing. Resident gets violent when under influence. Threat to staff, security and orderly operation of the institution. Resident denies has alcohol problem. Recommended that resident submit a contract to the next committee, to be reviewed in 30 days. No review in file.

10/18/76 — Possession of three gallons of pruno. Pleaded guilty. Said will appeal. No disposition.

10/22/76 — Possession of intoxicants.

1/14/77 — Failure to perform.

1/22/77 — Possession of two Sinequan, a hot medication not used by Resident Sargeant. Guilty. At time of shakedown, Sargeant admitted telling officer "he would belt him in the teeth, not just Holbrook, but anyone who tags him." (Sargeant accused guard of "hitting him in the nuts and told me he'd beat my head if I did it again.") Spit on officer.

2/2/77 — Threatening, possession of narcotic, endangering.

8/23/77 — "I found in this house [cell] a Sears catalog with some of the pages hollowed out and fitted with a small cardboard box with a small pipe within the box. Pipe smelled of a marijuana residue. Also when we searched this house Resident Sargeant was passed out on his bunk." Couldn't wake him. "Officers Bundy and myself tried to wake him to no end."

"Resident states he is a heavy sleeper and probably was in a deep sleep. Res. states the pipe was his and no other res. is guilty." Found guilty.

8/30/77 — Possession of narcotic paraphernalia.

9/28/77 — Possession of narcotics. Found guilty. Didn't show for hearing.

GREEN, C.J. (dissenting)—In my view, the trial court did not abuse its discretion in applying the general security order to Mr. Hartzog and his witnesses. Therefore, I dissent.

First, I disagree with the majority's interpretation that the security order requires two probe searches. They reverse and order a new trial *solely* because the second search is an unreasonable requirement. Neither the order nor the record supports that conclusion.

The order states:

> Inmates will be searched at the prison before departure. They will be brought to the Walla Walla County jail where they will be skin and probe searched under the supervision of the sheriff's personnel. . . .

The only probe search required by the plain language of this order is at the jail. The record corroborates this interpretation. There was only one probe search of Mr. Hartzog and that search occurred at the jail.[15] Neither Mr. Hartzog nor his counsel complain of more than one search—the one at the jail.[16] Consequently, in my view, the majority's

---

[15]Mr. Hartzog, in his affidavit, states: "The transportation of myself from the Washington State Penitentiary to the Walla Walla County Courthouse and the skin and probe searches took place as follows:

"A) At Washington State Penitentiary I was made to take off my clothes and put on a jump suit.

"B) Next a chain belt is placed around my waist with the chains to my ankles and chains to my wrist.

"C) I was then taken downtown to a small room, which I believe is in the county courthouse.

"D) For each search I was in the presence of one sheriff, one correctional officer from Washington State Penitentiary and one member of the hospital staff from the Washington State Penitentiary.

"E) The sheriff then ordered me to take off my jump suit. After doing this I was made to bend over a radiator, exposing my rectum to be searched. The hospital staff member then manually probed my rectum with his finger. I was then allowed to put the jump suit back on and was escorted into court."

[16]The majority, in a footnote, assumes that a probe search occurred at the prison because probe searches at the prison are common. There is nothing in the record to support that statement. Mr. Hartzog does not claim he was probe searched at the prison before being brought to the jail. As the security order indicates, in a prior case the court presumed that a probe search occurred before a

reversal on the ground that a second search is required is incorrect.

To the extent that the majority holds one probe search, preferably at the prison, would be a proper exercise of discretion, I agree and according to the record that is what occurred here.

A cursory reading of the cases cited by the majority demonstrates the widespread use by prisoners of their body cavities for the hiding of contraband. In *Daughtery v. Harris,* 476 F.2d 292, 293 n.1 (10th Cir. 1973), the chief correctional supervisor at the federal penitentiary in Leavenworth, Kansas, indicated that the following items had been found during probe searches of prisoners:

> Weapons of any type, sawblades, narcotics, intoxicants, barbituates [*sic*], money, pornography, single edge razor blades, or any item which might be used to effect an escape . . .

Here, one of the incidents giving rise to the security order involved an earlier trial of a prison defendant whose witness made a bomb with a Bic cigarette lighter. Carrying it on his person the day he testified, he found no opportunity to use it and passed it to another defendant. He brought it to the courthouse the next day and left it on the floor of the conference room where the prisoners were allowed to confer with their lawyers. While searching the room for contraband, a penitentiary correctional officer found the lighter, attempted to light it, and lost three fingers of his right hand in the resulting explosion. The superintendent of the penitentiary who testified in support of the security order alluded to this incident, and said:

> I would like the record to clearly show that I am in support of this [order] and for reasons really in addition to the ones stated in the order. Let me be more specific.

---

prisoner left the penitentiary, and yet, one of the witnesses carried a Bic lighter on his person the day he testified. Based on that presumption, a penitentiary correctional officer lost three fingers when the Bic lighter exploded. It is extremely dangerous to engage in a presumption of fact of this type and this court should not do so.

The bombing incident which took place at the last criminal trial here in Walla Walla County in the case of Agtuca and Gilcrist, *the information I have now available is that the bomb which went off was actually brought into this courtroom in a so–called Keister stash [cache] the day before,* and it was not able to be used because the person was brought right here in restraints until the very time he came in to the courtroom and then out, so it was taken back in to the institution.

The reason for the manufacture of the bomb was as a diversion or as an escape attempt. The prisoners realized that the only time that they are without restraints is when they are in the courtroom. This bomb was made and left as a booby trap for exactly the reason that it came off, for it to go off and cause great bodily harm so that the defendants who were then in the courtroom without restraints would be able while the officers on guard were being diverted by the plight of their fellow officer could make a run for it. There was a tradition for that mode of escape from the courtroom already cited by the prosecuting attorney. . . . It was Mr. Barrett . . . where he did bolt from this room and down the stairs and out the front door while being shot at by officers here.

(Italics mine.) The Keister cache introduced as an exhibit in this case contains a sharp–bladed knife and illustrates the type of container referred to by the superintendent. Uncomfortable as such an object must be when inserted into the body cavity, the possibility of its use cannot be ignored by a trial judge in protecting the security of his courtroom.

During the probable cause hearing held at the direction of the United States District Court, the prison records of Mr. Hartzog and his two witnesses were considered by the trial judge in determining the necessity for a probe search. These records disclosed that Mr. Hartzog was serving a maximum sentence of life with a mandatory minimum of 7 1/2 years for burglary and two counts of robbery with deadly weapons. Shortly after incarceration in 1972, a routine check of his cell disclosed 11 rounds of ammunition, a shank (cannery knife), and some drug paraphernalia. Since

that time, he has incurred one or more infractions of prison rules every year of his incarceration. These infractions dealt primarily with drugs or drug paraphernalia. However, in June 1976, it was discovered that he possessed a diagram of a handgun. His record also shows one escape from a reformatory honor camp prior to the convictions for which he is currently under sentence. While the instant charge was pending, Mr. Hartzog was found to have 2 1/2 gallons of "pruno" brewing under his bed.

Witness Manuel Rosalez was sentenced in 1972 for taking a motor vehicle without permission and for robbery while armed with a firearm. His sentence carries a 7 1/2–year mandatory minimum. In 1975, he attempted to escape from the prison while masquerading as a woman. Later the same year, a homemade knife was discovered on him in a spot check skin search. He too has a number of drug–related infractions.

Witness Lanny Sargeant was serving a sentence for second–degree assault. His prison record reflects drug–related infractions and belligerency toward prison guards. Although the record is ambiguous on this point, an intra–prison communication indicates he was serving time for second–degree murder.

Given this information, the trial judge ruled that probable cause existed to invoke the general order requiring a probe search of Mr. Hartzog and his two witnesses. After recounting the backgrounds of Mr. Hartzog and his two witnesses, the court said:

> This court is aware of the fact that Washington State Penitentiary is a maximum security institution containing many dangerous inmates, that there are know[n] incidents in this penitentiary of concealed contraband being carried by prison inmates, some of which in the rectal cavity. We have had a wounding of a penitentiary officer right here in this courthouse within the last year as a result of contraband being carried into this courthouse in the rectal cavity.
>
> I find that all of these factors constitute probable cause for the probe searches in this instance with regard to the

three persons who have been identified as witnesses in this case, including the defendant.

. . .

And we have further what I consider to be probably the most important thing; we have the inherent power of this court to provide for its security and the security of the persons who are required to be present in the court. *That includes members of the jury, court personnel, the attorneys, both for the state and for the defendant, and all supporting court personnel. It is this duty that is upon my shoulders, to provide for that security, that I feel is the most important factor.*

(Italics mine.)

In upholding a general policy requiring probe searches of inmates in the federal prison at Leavenworth, the court in *Daughtery v. Harris, supra,* perceptively observed, at pages 294–95:

Leavenworth is a maximum security institution containing many dangerous inmates and any consideration of the penitentiary's security regulations must be realistic. There are many known incidents of concealed contraband being carried by prison inmates in the rectal cavity. Several serious episodes, including the wounding of a court officer, were attributable to the ability of inmates to smuggle weapons out of prison. Given these circumstances coupled with an increasing need to assure the safety of our law enforcement and court officials, this policy of allowing rectal searches must be considered reasonable unless contradicted by a showing of wanton conduct. . . . To hold that known cause comparable to that required for a search warrant in private life must precede such a search would be completely unrealistic. It is usually the totally unexpected that disrupts prison security.

(Citation omitted.) There is no rational distinction between approval of general probe searches for prison security and a court's order of a probe search for courtroom security. Thus, I would affirm the trial judge's exercise of discretion in applying the order to Mr. Hartzog and requiring that he be probe–searched prior to his appearance in the courtroom.

In light of this holding, I must consider Mr. Hartzog's challenge to the requirement that he and his witnesses testify in shackles. Because they refused to submit to a probe search, Mr. Hartzog and his witnesses did not appear in the courtroom for the trial. Instead, their testimony was taken on video tape at the Walla Walla police station and later shown to the jury. The jury was cautioned before trial and after the evidence had been presented:

> You are instructed that the security measures taken in penitentiary trials are the joint product of the penitentiary administration, the sheriff and the Court; that they are utilized routinely; and that no inference is to be drawn from the security measures taken as to guilt or innocence of the defendant or that any particular inmate is a security risk since the same procedures apply to all inmates regardless of their conduct records in the institution.

This court has viewed the video tape and noted that the shackling of Mr. Hartzog and his witnesses is hardly evident to the viewer. Considering this circumstance in light of the trial court's two cautionary instructions, I find no error.

Second, I disagree with the majority's holding that the security order must be applied on a case–by–case basis following a probable cause hearing. None of the cases cited by the majority are concerned with the kind of circumstances presented here. They are routine cases in a relatively stable environment. In my view, exigent circumstances exist in this case and require a departure from the traditional rule that shackling should be ordered only on an individual basis following a probable cause hearing.[17]

The exigent circumstances to which I refer are as follows: The Washington State Penitentiary, a maximum security prison, is located in Walla Walla County with a population of about 45,000. As noted by the prosecuting attorney in his

---

[17]It should be noted that prison policy orders authorizing general visual or probe searches of inmates for security purposes have been upheld without requiring an individualized showing of probable cause. *Bell v. Wolfish,* 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *Daughtery v. Harris, supra.*

presentation to the trial judge, the number of criminal cases arising out of the penitentiary and the security problems involved in the trial of those cases have increased dramatically. This court must judicially recognize that this penitentiary has been in a state of serious ferment and upheaval almost continuously during the past decade. At the time the security order was signed, the prison population was in lock–up according to the prosecuting attorney. Hunger strikes, riots and violence in the penitentiary have been constantly reported in the local and statewide media. It has been of serious and fearful concern to the residents of Walla Walla. Even as this opinion is being written, prison inmates are involved in a civil rights proceeding in federal court against the State and prison officials, charging cruel and inhuman punishment. This tension and turmoil within the institution, irrespective of its cause, has manifested itself in increasing disrespect for the court, disruptive acts during trial and, finally, the endangering of human life through the use of the cigarette lighter bomb.

It is in the context of these continuing events that the trial court determined there was probable cause to enter a general security order governing every prison defendant and prison witness, whether for the State or the defendant, and requiring a probe search and arm and leg restraints for the security of the courtroom. The question is whether these circumstances are sufficiently exigent to justify a general order dispensing with individualized probable cause hearings. I think they are and the order should remain in effect until it is shown that the tensions at the prison and in the courtroom have subsided.[18]

At the time the security order was entered, Judge Tuttle made the following observations and then applied them in State v. Snook, Walla Walla County cause No. 68330:

---

[18]This type of order does not differ in principle from the general requirement that all citizens visiting adjoining countries submit to a border search. *Almeida–Sanchez v. United States,* 413 U.S. 266, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973).

I would just like to comment at this particular point where we have just been going over all of these people who are high security risks in the Snook trial. If we were to pick and choose among inmates and provide shackles or restraints for some and not for others, it would be perfectly obvious to the jury that we had selected so-and-so as being a high security risk. That's the reason why it seems to me that we have to treat these penitentiary cases as all witnesses who are inmates being potential security risks and treat them all alike. That way it doesn't result in the prejudice it would were we to bring one man in shackles and the next four unshackled and nobody sitting close to him and so on. As far as the stage setting is concerned for the jury, each man who takes the witness stand is going to have to take it under the same set of circumstances or otherwise I think you could make a logical argument that there is prejudice resulting in it. But I don't see how you can make the argument there is prejudice resulting if they are all treated in the same way simply by reason of their status as being inmates in the state penitentiary.

. . .

All I can say is I think that the realities of today's situation mandate the kind of an order which I have entered, and it ought to be constitutional.

. . .

. . . In my opinion, the matter of clothing and the matter of restraining and the matter of posting guards and all the rest is more an abstraction than it is dealing realistically with the problem of prejudice, and I just don't believe if we try all these as routine security measures and inform the jury that this is the way it's done in penitentiary cases that realistically any prejudice results. In my opinion, I think if it is made obvious to the jury that proper security measures have been taken for their protection as well as everybody else in the courtroom, we are more likely to wind up with a fair trial than we are if we do it some other way.

Furthermore, the Walla Walla Superior Court judges, who are all long–time residents of the county and familiar with the community and can sense the concerns and attitudes of potential jurors, assert that jurors have expressed to them the fact that they are not prejudiced by the

enforcement of the court's security order. The judges state that jurors have expressed a feeling of security when prison defendants and witnesses are restrained, and this allows them to listen to the evidence undistracted by their fears. The juror expressions of the lack of prejudice in the use of courtroom restraints is confirmed by the judges' observation that many defendants in restraint under the order are found not guilty.[19] This is understandable because the

---

[19]Judge Tuttle's reasons for entering the security order were reaffirmed by Judge Mitchell when he applied the security order to Mr. Hartzog. After reserving ruling upon whether he would allow Mr. Hartzog to be seated at the counsel table, he said:

The security order that has been adopted by this court provides a number of safeguards with regard to the appearance in the courtroom, such as instruc-·tions to the jury, both prior to trial and prior to submission of the case, that the security measures are routine and are not to be considered as any evidence either of any dangerous tendencies of any particular individual or of the defendant in the case at hand, nor to be considered at all with regard to the determination of guilt or innocence in the case at hand.

By the nature of a proceeding in which a resident of the penitentiary is a defendant, there is no way that a jury is not going to know that the defendant is a convicted felon. The cases that I am sure counsel for the defendant is referring to, United States Supreme Court cases, concerning appearances in court, type of clothing worn and so forth, I do not feel are applicable in this situation.

Insofar as the claim of prejudice in the minds of the jury, I am satisfied from experience here that that is not the case. On the contrary, I have had jurors talk to me following trials in which these measures have been imposed, and they have indicated to me that there was no prejudice but, on the contrary, there was a feeling of security in their minds, a feeling that they were more able to listen to all of the evidence and to consider it without being distracted by other influences or fears, whether real or imaginary, in their minds. I am satisfied that we have had Washington State Penitentiary inmates here in trial as defendants under the safeguards that are contained in our security order, and they have been found not guilty, and I just don't think that you can say that type of thing creates a prejudice in which they are all going to be found guilty.

This court has an obligation to jurors, witnesses, parties, spectators, and court personnel, to provide for security; and it's going to be carried out unless this is either set aside by the Federal Court or set aside on appeal.

In a case presently pending in this court, State v. Simmons, Court of Appeals cause No. 3859–9–III, Judge Reser refers to two aggravated first–degree murder cases in which the prison defendant, his witnesses, and the witnesses for the State were all placed in arm and leg restraints and the jury brought in verdicts of acquittal. In a third case, the only inmate witness was the defendant who was

prison is in their county and they are aware of the prison turmoil because of extensive news coverage. Further, the jurors are twice cautioned not to draw any inferences from the restraints.

Considering the entire record and facts judicially noticed, I do not find an abuse of discretion in applying the security order to Mr. Hartzog. Neither do I find an abuse of discretion in applying the order to all prison defendants and prison witnesses so long as the tensions between the prisoners and the administrative authority persist at the prison. In the context of the unique situation presented in this case, it is not possible for this court or the trial court to predict when a violent act will or will not occur. It is unrealistic, in the current situation, to require such prediction by the trial court at the risk of jeopardy to those attending a trial. The trial court has a heavy obligation to protect all persons in attendance at a trial. It is in the best position to recognize the measures that must be taken to that end while preserving a defendant's right to a fair trial. An appellate court, removed from the real situation, should not second–guess the trial court unless there is a clear abuse of discretion. In my view, there was no abuse of discretion in this case.[20]

---

shackled and the trial resulted in a hung jury. Further, Judge Reser refers to the recent trial of George Simmons in Seattle where at the outset restraints were not required. During trial, according to news accounts, Mr. Simmons grabbed a knife from the exhibits and started toward a witness. A shot by an officer ricocheted off the granite floor and walls before the defendant was apprehended. The record shows he was then restrained, and later convicted of second–degree murder which Judge Reser stated was not "remarkable in view of the fact that George Simmons had made numerous confessions to the murder."

[20]I note that Judge Reser in State v. Simmons, *supra* at n.3, indicates that modesty shields have been installed in his courtroom to conceal the leg restraints and that the defendant Simmons would be permitted to have one free hand to take notes. This seems to indicate that the court is making an effort to conceal the restraints as much as practicable. This practice is to be commended. I suggest that the court also give consideration to other types of restraints that might reduce any noise that could be made from the chains or arm and leg restraints compatible with the necessary security of the courtroom, *e.g.*, a weighted boot on one of the feet, etc.

Therefore, I would affirm.

Reconsideration denied August 4, 1980.

Review granted by Supreme Court November 19, 1980.