[No. 35206.   *En Banc.*   September 22, 1960.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES MICHAEL MURPHY, *Appellant.*[1]

[1]Reported in 355 P. (2d) 323.

*Murray B. Guterson* and *Alfred J. Bianchi,* for appellant.

*Charles O. Carroll, Joel A. C. Rindal,* and *Anthony Savage, Jr.,* for respondent.

*Ralph W. Johnson, Leonard W. Schroeter,* and *David P. Skellenger, amici curiae.*

FINLEY, J. — Appellant, James Michael Murphy, was charged (by information filed by the state of Washington, respondent herein, on October 6, 1959), with the crime of murder in the first degree, alleged to have been committed as follows:

"He, the said JAMES MICHAEL MURPHY, in the County of King, State of Washington, on or about the 2nd day of October, 1958, with a premiditated design to effect the death of one Robert Jack Blair, a human being, and while then and there engaged in committing, attempting to commit or in withdrawing from the scene of the commission of a felony, to-wit: Robbery, willfully, unlawfully and feloniously did strike, beat and wound the said Robert Jack Blair, with a certain weapon, to-wit: a softball bat, then and there held by him the said James Michael Murphy, and then and there did shoot at, toward and into the body of the said Robert Jack Blair, with a certain deadly weapon, to-wit: a .25 caliber pistol then and there had and held by the said JAMES MICHAEL MURPHY, thereby mortally wounding the said Robert Jack Blair, from which mortal wounds the said Robert Jack Blair then and there died; . . ."

To this charge, appellant entered an oral plea of not guilty, and filed a special written plea of not guilty by reason of insanity. However, at the jury trial in King County superior court, appellant, testifying in his own behalf, freely and candidly admitted commission of the acts alleged in the information. Relying solely upon his special plea of insanity, he called upon two expert witnesses: Dr. S. Harvard Kaufman, a psychiatrist; and Mr. Theodore D. Tjossem, a psychologist.

Both of these witnesses testified that appellant was suffering from a mental illness which they denominated a "character neurosis." Basing their opinion upon a thorough examination of the appellant, both doctors further stated that they believed appellant was able to distinguish be-

tween right and wrong. Appellant Murphy testified that at the time he committed the crime he knew that what he was doing was wrong.

Thereupon, the trial judge, on the ground that there was no evidence to support appellant's special plea, granted the state's motion to withdraw the issue of insanity from the consideration of the jury. The judge also rejected appellant's proposed instruction encompassing the so-called "Durham" test of insanity (*Durham v. United States* (1954, D. C. App.), 214 F. (2d) 862, 45 A. L. R. (2d) 1430.) The pertinent portion of appellant's proposed instruction read:

"If, however, you do find that the accused suffered from a mental disease or defect and that the criminal act which he committed was a product of such mental disease or defect, you must then find the accused not guilty by reason of insanity."

The jury returned a general verdict finding the appellant guilty of first degree murder, as charged; and in addition, a special finding that the death penalty be inflicted.

Appellant's motion for a new trial urged, first, that the trial judge had erroneously disposed of the insanity issue and of the above-noted proposed instruction relating thereto; further, that appellant had not had a fair trial. In support of this latter contention, appellant claimed that at the time he was on the witness stand, testifying in his own behalf, he was under the influence of certain tranquilizing drugs. After a hearing, at which considerable evidence relating to the tranquilizers was introduced (to be noted later in this opinion), the trial judge denied the motion for a new trial and entered judgment and sentence on the jury's verdict. This appeal followed.

Appellant has made three assignments of error:

"1. The court committed prejudicial error in removing the question of appellant's insanity from the consideration of the jury.

"2. The court committed prejudicial error in refusing to instruct the jury in accordance with appellant's proposed Instruction No. 1.

"3. The court committed prejudicial error in failing to grant appellant's motion for new trial because of his de-

meanor and conduct as a witness while under the influence of tranquilizing drugs administered without authority and without the knowledge of appellant or his counsel."

■ Appellant's contentions that the trial court erred (a) in withdrawing the matter of insanity from the consideration of the jury, and (b) in rejecting appellant's proposed instruction relating to mental irresponsibility, are without merit unless we are to recede from the decision of this court in *State v. Collins* (1957), 50 Wn. (2d) 740, 314 P. (2d) 660. There, after an exhaustive consideration of the problem, this court rejected the test or theory encompassed in appellant's proposed instruction No. 1, *supra,* and adhered to the traditional, but often criticized, right-and-wrong test exemplified in the well-known *M'Naghten* case, 8 Eng. Rep. 718 (1843), stating, among other things:

" . . . that a defendant, to establish a defense of mental irresponsibility, must prove that he did not have the mental capacity to distinguish between right and wrong with reference to the act complained of."

We see no reason at this time to deviate from the rule of law applied in the *Collins* case; consequently, no further comment is necessary respecting appellant's first two assignments of error.

■ We turn now to a consideration of appellant's third assignment of error, relating to the tranquilizing drugs. The facts regarding this aspect of the case are essentially undisputed. During the period prior to trial, at which time appellant was confined in the King County jail, he was interrogated on numerous occasions by his court-appointed counsel, Mr. Murray Guterson and Mr. Alfred Bianchi. On each of these occasions, according to the testimony of Mr. Guterson, appellant appeared to be

" . . . extremely nervous, extremely taut, extremely changing from a sweating condition to a very cold and clammy condition, and it made little or no difference what the topic or subject matter of our discussion concerned, we might be discussing matters entirely foreign to the actual proceedings which were to face us in April, and still his demeanor on all of these matters was such to make me feel as a layman that he was extremely nervous and taut and

unable to properly express himself or to control his emotions satisfactorily. . . ."

Mr. Bianchi described appellant's appearance on these occasions as follows:

" . . . Either when I confronted him or interrogated him by myself or in your [referring to Mr. Guterson] presence, I noticed immediately that he was tense, he was taut, he was anxious, deliberate in anything he said and that he said it slowly and very hesitantly told me about the circumstances of this crime or any interrogation that I directed his way. He always interlaced his fingers, was pale, on numerous occasions when I shook his hands his hands were clammy and he always gave me the impression he was very distrought and concerned and anxious about this. At first I felt that it was because of his reluctance to tell about the crime and then I felt he would open up later, but this attitude was maintained throughout."

After consultation between appellant and his counsel, it was decided that appellant should participate in the trial as a witness in his own behalf. Trial commenced on April 6, 1959. The state rested its case on the afternoon of April 7, 1959. On the morning of April 8, 1959, prior to being conducted from the county jail to the courtroom, appellant complained of a severe cold to one Robert Gibson, a fellow prisoner, who was also serving as a medical trusty under the supervision of the jail physician. Gibson gave appellant a pill containing equanil, a tranquilizing drug, at about 8:30 a. m., and saw appellant take the pill. At about 9:00 a. m., Gibson gave appellant two pills containing trancopal, another tranquilizing drug, and saw him take one of them. Although appellant was told that these latter two pills were tranquilizers, he had never taken a tranquilizer before and did not know their effect.

Thereafter, appellant was conducted to the courtroom. He took his place on the witness stand at about 10:00 a. m. In response to questions posed by Mr. Guterson, he first described in some detail the events of his life leading up to the commission of the crime charged. He then candidly testified with respect to his commission of the criminal act itself.

According to the undisputed testimony of Mr. Bianchi and Mr. Guterson, appellant's appearance, demeanor, and manner of speaking while on the witness stand were markedly different from what they had been during the numerous pretrial interrogations. On this point, Mr. Bianchi testified that:

" . . . I particularly noted in comparing him relating the crime to me on these numerous occasions, either alone or in your company [referring to Mr. Guterson], and his relating the crime in this particular situation, he was, in my opinion, casual, cool, not at all perturbed and showed a lackadaisical attitude."

Mr. Guterson testified:

"Q   Did you notice any difference, in your opinion, in his demeanor or attitude or expression?  A   I most certainly did. I noticed a change that was beyond comprehension in my humble opinion as a layman. It was an entirely different approach to the entire subject matter and I was at a loss to understand it."

Appellant has not claimed, either before the trial court or on this appeal, that the tranquilizing drugs affected the *content* of his testimony. He has not asserted that the fact he testified while under the influence of the drugs had any bearing upon the jury's general verdict finding him guilty of first degree murder, as charged. Rather, defense counsel's contention in the trial court and on this appeal is that, but for appellant's casual, cool, somewhat lackadaisical attitude, appearance and demeanor, induced by the tranquilizer drugs, the jury might not have imposed the death penalty. The trial judge's answer to this claim, as stated in his oral ruling denying the motion for new trial, was that

" . . . although I believe the tranquilizer relaxed him [the appellant], I feel that it did not affect the jury in their verdict."

The difficulty with this answer is that neither the trial judge nor the members of this court on appeal can know to what extent, if any, appellant's attitude and appearance as a witness influenced the jury with respect to the penalty

to be imposed. Pursuant to RCW 9.48.030, full and absolute responsibility has been placed upon the jury to determine whether, in a first degree murder case, the death penalty shall be imposed.[2] However, the statute does not set forth any criteria to be considered by the jury in exercising this grave responsibility. Yet, as a practical, common-sense matter, it can hardly be denied that in a case such as this, where the defendant appears as a witness and admits committing the criminal acts charged, constituting first degree murder, a significant consideration in the minds of the members of the jury respecting the penalty to be imposed may well be their evaluation of defendant's attitude in regard to the crime he has committed.

Article I, § 22 (amendent 10) of our state constitution, declares that

"In criminal prosecutions the accused shall have the right to appear and defend in person, . . ."

Of this right, this court, in *State v. Williams* (1897), 18 Wash. 47, 50 Pac. 580, stated:

"The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, . . ."

We believe that this right is of particular significance in a case such as that now before us, where the matter of the life or death of the accused may well depend upon the attitude, demeanor and appearance he presents to the members of the jury, who are the ultimate determiners of his fate. In such a case, strong and compelling reasons manifestly exist for careful judicial scrutiny of every aspect of the trial afforded to the accused to the end that a new trial be granted in the event of a showing by the accused of a

---

[2]"Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided. . . ."

reasonable possibility that his attitude, appearance, and demeanor, as observed by the jury, have been substantially influenced or affected by circumstances over which he had no real control. We are satisfied that such a showing has been made in the instant case; i.e., it reasonably appears in the instant case that the attitude, appearance, and demeanor of the accused may have been influenced by the tranquilizer drugs, administered to him under at least a semblance of authority or approval from the public officers who had custody over him, and taken by the accused apparently without awareness of their probable effect upon him.

We do not intend to suggest that a new trial must be granted in every criminal case—or even in every capital case—where the appearance of the accused before the jury is marred by some mental, physical, or emotional impairment, regardless of the nature of the impairment, or the means by which it was brought about. Each case of this type must be decided on its own facts. In any event, in the instant case, we are convinced for the reasons indicated above that a new trial should be granted. It is so ordered.

WEAVER, C. J., DONWORTH, ROSELLINI, FOSTER, and HUNTER, JJ., concur.

MALLERY, HILL, and OTT, JJ. (dissenting)—We would affirm.