[No. 710-1. Division One—Panel 1. December 20, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN LESLIE MARYOTT, *Appellant*.

*Hohlbein, VanDerhoef & Sawyer* and *Wesley G. Hohlbein,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Stewart P. Riley, Deputy,* for respondent.

UTTER, J.—John Maryott appeals from a conviction on two counts of robbery and one count of first-degree assault. One robbery involved a pharmacy in Seattle. The second robbery involved a grocery store. During the second robbery, Maryott shot and wounded a clerk.

Three questions are raised on this appeal. Does the state have the right, over the objection of a defendant, to administer drugs which affect his mental and/or his physical ability at the time of trial? And, as a subsidiary question, may the state so act when the defendant's mental responsibility to commit the crime charged is at issue? We hold the state may not so act in either circumstance, reverse the conviction and remand the case for a new trial. The third issue is whether the trial court erred in holding Maryott was competent to stand trial. We affirm the court's finding of competency.

Maryott had a history of emotional illness and hospitalization for emotional problems. He had also been arrested a number of times and previously served time in prison. During the trial, Maryott was given substantial dosages of sparine, librium and chloral hydrate by his jailers. There is no showing that this medication was ordered by the court, either on its own motion or as the result of a hearing. His counsel repeatedly requested to have him taken off the drugs and, in one instance, Maryott indicated he would like the jury to see how excitable he could get in an undrugged condition. The requests were not granted, and he was tried while under the influence of tranquilizers.

Expert testimony indicated the dosages administered would affect the thought, expression, manner and content of the person using the drugs. At trial, Maryott was observed to be sitting hunched over, staring vacantly ahead. His counsel testified Maryott was suspicious and uncommunicative and refused to assist in his defense. A friend testified

Maryott was dull and listless during the trial and did not act like himself.

■ Freedom of thought and speech is the matrix, the indispensable condition of nearly every other form of freedom. *Palko v. Connecticut*, 302 U.S. 319, 326, 82 L. Ed. 288, 58 S. Ct. 149 (1937). We are here concerned with state action which may infringe on the ability to think and its conflict with due process of law. In *Palko*, the court noted its judgments had enlarged the domain of liberty protected by the Fourteenth Amendment to include liberty of mind, as well as liberty of action. The recognition of the dimensions of protections needed, guaranteeing liberty of the mind and freedom of thought, has been a slowly evolving process. The court could at one time say with confidence, "Freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind." *Jones v. Opelika*, 316 U.S. 584, 618, 86 L. Ed. 1691, 62 S. Ct. 1231 (1942). The development of psychochemicals since that opinion in 1942 raises a question about the degree of assurance with which Mr. Justice Murphy could make that statement today.

The assurance of freedom of thought, free from any unconsented control by the state, in a trial where man's liberty is at stake is the question here presented. The nature of our legal system has, at its heart, the adversary process whereby the state and the defendant, by contending vigorously but fairly against each other, are able to present the total factual and legal issues from which a trier of fact may arrive at a decision. When the state is allowed, during the time of trial, to administer drugs to a defendant, contrary to his will, it is able to affect the judgment and capacity of its own adversary. Our total legal tradition is contrary to this. Although drugs have not always been the subtle menace they now are in our society, action by the state which affected the reason of a defendant at the time of trial by other means was forbidden at an early time.

Chains and irons used in ancient times on prisoners not only restrained escape but were of such a nature as to

inflict torment affecting the ability of a prisoner to freely use his mental faculties to best advantage. *The Trial of Christopher Layer* [K.B.], 16 How. St. Tr. 93, 223 (1722). Sir Edward Coke, in commenting on the right of a criminal defendant to be unfettered in the courtroom, noted, "Bracton saith, . . . [i]f felons come in judgement to answer, . . . they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will." 3 E. Coke, Institutes 34 (1797).

The right of a prisoner to be free of restraints which affect his reason was recognized as a constitutional right in *People v. Harrington,* 42 Cal. 165, 168, 10 Am. R. 296 (1871) where the court stated, "[A]ny order or action of the Court which, without evident necessity, imposes physical burdens, pains, and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense." The fact that a prisoner appears in shackles may, to some extent, deprive him of the free and common use of all his faculties and is held to be a "denial of the fair trial guaranteed under the Sixth Amendment to the Federal Constitution." *State v. Roberts,* 86 N.J. Super. 159, 206 A.2d 200 (1965).

Washington has recognized it was the ancient rule of common law that a prisoner brought into the presence of the court for trial, upon a plea of not guilty to an indictment, was entitled to appear free of all manner of shackles or bonds unless there was evident danger of his escape. *State v. Williams,* 18 Wash. 47, 50 P. 580 (1897). The court observed, "The common law of England was expressly adopted by legislative enactment . . . of this territory, and there is no doubt that the ancient right of one accused of crime under an indictment or information to appear in court unfettered, is still preserved in all its original vigor in this state." The court further noted, "Section 22, art. 1, of our constitution, declares that, 'In criminal prosecutions the

accused shall have the right to appear and defend in person.' The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, and unless some impelling necessity demands the restraint of a prisoner to secure the safety of others and his own custody, the binding of the prisoner . . . is a plain violation of the constitutional guaranty."

The abhorrence expressed by the cases from the early beginnings of our law to the present time restricting courts from measures which could affect the ability of a man on trial to freely use his mental faculties takes on the substance of a due process right. We believe this right to be "so rooted in the tradition and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts*, 291 U.S. 97, 105, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934), and as well "implicit in the concept of ordered liberty." *Palko v. Connecticut, supra* at 325. Its historical development reflects that it does, in fact, offend those canons of decency and fairness which express the notions of English speaking people even toward those charged with the most heinous offenses. *Malinski v. New York*, 324 U.S. 401, 416, 89 L. Ed. 1029, 65 S. Ct. 781 (1945).

The application of the principles gleaned from the cases involving chaining and shackling to cases involving forced intake of drugs is, we believe, a difference only in degree and not in substance. To apply the historical concerns about shackling to cases involving drugs, which may have these same or more deleterious effects, is only to give a more current application to a basic concern. This, as we see it, is giving current meaning to the vague contours of the term "due process." We can say this procedure, as shown in this trial, does offend a "sense of justice." *Brown v. Mississippi*, 297 U.S. 278, 285, 286, 80 L. Ed. 682, 56 S. Ct. 461 (1936). The historical abhorrence of any measures which affect a person's mind at the time of trial; the loss of an individual's exclusive control of his mental processes at the time of trial; and the compromising of the adversary process each furnish sufficient reason for us to say the four-

teenth amendment to the United States Constitution, as well as article 1, section 3 and article 1, section 22 of the Washington State Constitution have been violated.

On the subsidiary question of whether the state may, over the objection of the defendant, administer drugs which affect his mental and/or physical ability at the time of trial when his mental responsibility to commit the act is at issue, due process of law requires as a minimum a right of a defendant to examine the witnesses against him, to offer testimony, and to be represented by counsel. *In re Oliver*, 333 U.S. 257, 92 L. Ed. 682, 68 S. Ct. 499 (1948).

When mental competence is at issue, the right to offer testimony involves more than mere verbalization. The demeanor in court of one who has raised the issue of his sanity is of probative value to the trier of fact. *United States v. Chandler*, 72 F. Supp. 230 (D.C. Mass. 1947); 4 J. Wigmore, Evidence § 1160 (3d ed. 1940). In the instant case, the jury was instructed to give weight to the demeanor of witnesses and Maryott testified in his own behalf. Maryott claimed to be highly excitable because of his mental condition; yet, the jury saw him as very quiet because he was drugged.

In *State v. Murphy*, 56 Wn.2d 761, 355 P.2d 323, 83 A.L.R.2d 1061 (1960), a defendant was on trial for his life and was granted a new trial because he had been tried in a drugged condition. The court reasoned the demeanor of the defendant could influence the jury in assessing the death penalty and noted "the matter of the life or death of the accused may well depend upon the attitude, demeanor and appearance he presents to the members of the jury." It calls for "careful judicial scrutiny of every aspect of the trial afforded to the accused to the end that a new trial be granted in the event of a showing by the accused of a reasonable possibility that his attitude, appearance, and demeanor, as observed by the jury, have been substantially influenced or affected by circumstances over which he had no real control."

In the instant case, as in *Murphy*, the demeanor and

attitude of the defendant are of particular significance. If the state may administer tranquilizers to a defendant who objects, the state then is, in effect, permitted to determine what the jury will see or not see of the defendant's case by medically altering the attitude, appearance and demeanor of the defendant, when they are relevant to the jury's consideration of his mental condition.

Our court held in *State v. Gwaltney*, 77 Wn.2d 906, 468 P.2d 433 (1970) that the *Murphy* reasoning may not be extended to cases where all relevant factors affecting the capabilities of the defendant to emotionally communicate his feelings are known to the defendant and his counsel and can be explained to the jury. *Gwaltney* does not discuss involuntary administration of drugs to a defendant by officers of the state and is concerned only with an apparent inappropriate facial expression on the part of a defendant that the state had no part in producing. It cannot be extended to allow the state to erase, by drugs they have administered, the major contours of the demeanor, appearance, and attitude of a defendant who is pleading his mental condition and then explain to the jury what they have, in effect, chosen for the jurors not to see.

■ There may be some instances in which the state may medicate an individual even when the medication may affect the individual's mental process, *e.g.*, the treatment of one committed, after due process, to an institution. However, instances where the state may control acts, not thoughts, are exceptions to the rule and do not apply here.

In the case before us, Maryott was not found incompetent, there was no showing of a parens patriae relationship between defendant and the state, and he was not on continuous medication at the time he was released from prison. There is no indication the state administered drugs to the defendant for any reason other than controlling his behavior in court.

Every accused has a fundamental right to be present at his trial and to confront the witnesses against him. This right derives from common law. *Miles v. State*, 222 Ind.

312, 53 N.E.2d 779 (1944). It is guaranteed by the due process clause and the sixth amendment to the United States Constitution and article 1, section 22 of the Washington State Constitution which declares: "In criminal prosecutions the accused shall have the right to appear and defend in person." RCW 10.46.120 provides, "No person prosecuted for an offense punishable by death, or by confinement in the penitentiary or in the county jail, shall be tried unless personally present during the trial."

These rights are not absolute, however, and we do not mean to ignore the state's interest in an orderly trial. "The safeguards that the constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." *Illinois v. Allen,* 397 U.S. 337, 347, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970) (concurring opinion). In *Allen,* the United States Supreme Court held a defendant's fundamental right, in that case the Sixth Amendment right to be present, may be limited or lost when his conduct made an orderly trial impossible and that after a defendant has been guilty of outrageous conduct in court, he may be cited for contempt, bound and gagged, or removed from the courtroom depending on which is the fairer, more reasonable way.

In the instant case, it is difficult to see a legitimate state interest in imposing drugs on a defendant who asks to be free of them. If the motive is to control a possibly obstreperous defendant, two conclusions are suggested, analogously, by the reasoning in *Allen.* First, no control should be imposed until its need has been demonstrated. Second, the control which is imposed should insure an orderly trial with the least interference with a defendant's rights.

Situations may conceivably occur in which the conduct of a defendant may be such as to require physical restraint or removal, as in *Allen.* When a defendant goes so far as to deliberately induce his own incompetence, the trial may

proceed without him. *People v. Rogers*, 150 Cal. App. 2d 403, 309 P.2d 949 (1957). While none of the alternatives are totally compatible with the ideal of the Sixth Amendment rights of confrontation and presence, we believe they contain less potential for mischief than to allow the state to drug a defendant without his consent.

■ As a separate issue, apart from his challenge to the state's administration of drugs to him, Maryott challenges the trial court's determination that he was competent to stand trial. A pretrial hearing was held to determine his competency. At the hearing, the court heard expert testimony from which it could be concluded that Maryott was capable of understanding the nature of the proceedings against him and rationally assisting his counsel. The court allowed the issue to remain open during the trial. As the trial progressed, additional testimony was given which arguably indicated competence. In Washington, no specific procedure is required to determine competence. However, a criminal court may, in its discretion, enter upon an examination of the question of competence. *State v. Tate*, 74 Wn.2d 261, 444 P.2d 150 (1968). A defendant has been held to be competent to stand trial "if he is capable of properly understanding the nature of the proceedings against him and if he is capable of rationally assisting his legal counsel in the defense of his cause." *State v. Gwaltney*, 77 Wn.2d 906, 907, 468 P.2d 433 (1970).

To be competent to stand trial, a defendant must be able "to confer with or [assist] counsel, . . . to testify, [or] . . . to understand the nature of the accusation or the mechanics or consequences of the trial." *In re Dennis*, 51 Cal. 2d 666, 335 P.2d 657 (1959). Courts have held that an accused may not be tried when he is so drugged or intoxicated he is, in effect, not there at all. It is the duty of a court to inquire into the effect of drugs upon a defendant. *Pledger v. United States*, 272 F.2d 69 (4th Cir. 1959).

The courts have not found the presence of drugs per se to render a defendant incompetent. Where massive doses of thorizine did not impair defendant's ability to understand

or assist in his defense, he was found competent to stand trial. *State v. Goodin,* 1 Ore. App. 559, 465 P.2d 487 (1970).

It appears from the record there is substantial evidence from which the trial court could find that Maryott was able to confer with or assist counsel, to testify and understand the nature of the accusations or the mechanics or consequences of the trial. The constitution does not authorize this court to substitute its findings for that of the trial court and we find no error in the court's determination of competency. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

The judgment of the trial court is reversed and the case is remanded for a new trial.

HOROWITZ, C.J., and WILLIAMS, J., concur.