COMMONWEALTH vs. PETER LOURAINE.

Hampden.  March 8, 1983. — August 24, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Homicide. Insanity. Practice, Criminal,* Competency to stand trial,
  Medication of defendant during trial. *Evidence,* Sanity. *Constitu-
  tional Law,* Admissions and confessions.

The defendant at a murder trial, who had raised an insanity defense,
    was entitled to have the jury observe his demeanor in an unmedicated
    condition, and, where the Commonwealth was permitted, over his ob-
    jection, to administer antipsychotic medication to him which visibly
    affected his demeanor and mental processes at trial, he was denied his
    right to a fair trial as guaranteed by the Sixth and Fourteenth Amend-
    ments to the United States Constitution and art. 12 of the Massachu-
    setts Declaration of Rights.  [32-38]
At a murder trial in which the defendant had claimed insanity, it was
    error for the judge to admit in evidence certain statements by the
    defendant to police, made at a time when he was neither in custody
    nor under suspicion, in the absence of findings by the judge that the
    statements were voluntary and were the product of a rational intellect.
    [38-40]
At the retrial of an indictment for murder in the first degree defense coun-
    sel would have the burden of requesting jury instructions concerning
    the effect of the defendant's drug use with respect to deliberate
    premeditation and extreme atrocity or cruelty.  [40]
Evidence at a murder trial was sufficient to warrant the jury in finding
    the defendant guilty of first degree murder on the theory of premedita-
    tion, assuming that they found him to be legally sane.  [40-41]

INDICTMENT found and returned in the Superior Court
Department on June 13, 1979.

A pretrial motion was heard by *Murphy, J.,* and the case
was tried before *Urbano, J.*

*Myles D. Jacobson (Maureen B. Brodoff* with him) for the
defendant.

*William T. Walsh, Jr.,* Assistant District Attorney, for the Commonwealth.

LIACOS, J.   On May 26, 1979, the defendant allegedly stabbed Albert Zalucki twenty-one times.   Zalucki died, and the defendant was indicted for murder in the first degree.   He was convicted by a jury on March 16, 1982, of murder in the first degree, and was sentenced to a term of life imprisonment.   He now appeals his conviction pursuant to G. L. c. 278, § 33E.

The defendant alleges error on a number of grounds, but primarily relies on his claims that (1) he was deprived by a ruling of a motion judge of an opportunity to present his demeanor in an unmedicated condition to the jury; (2) the trial judge failed to take appropriate steps during the trial to determine his continued competency to stand trial; (3) the trial judge failed to instruct the jury correctly; and (4) the trial judge neither ruled on the question of the voluntariness of certain statements made by the defendant nor submitted the issue to the jury.   The defendant also asks us to exercise our power under G. L. c. 278, § 33E, to order a new trial or to mitigate the degree of guilt.   We reverse the judgment of conviction.

There was evidence of the following facts.   On May 26, 1979, at approximately 3 A.M., two police officers responded to a call to go to 23-B Van Buren Avenue in Springfield. When the officers proceeded inside, they found the body of Zalucki.   They heard a voice from the second floor.   Looking up, they saw at the top of a staircase the outline of a large male.   When they identified themselves as police officers, the man responded, stating, "I called the police. I stabbed him. I'm Peter Louraine."   At the trial, one of the arresting officers identified the man who spoke as the defendant. Several officers present at the scene testified that the defendant appeared calm, and recognized one of the officers as a high school classmate.   A bloodied knife found by police officers near the body of Zalucki was placed in evidence.

Deborah Flebotte, a stepsister of the victim, testified that Louraine lived at 23-B Van Buren Avenue with a second

stepbrother, John Regan.[1]  She testified that Zalucki had
visited Louraine and Regan at the apartment and that
Louraine, several hours before the murder, told her that
Zalucki would be stopping by later.

The Commonwealth presented expert medical testimony
that the victim had been stabbed twenty-one times.  The
wounds were concentrated in the area of the neck, chest,
and abdomen, and had been inflicted rapidly.  There were
also "defense wounds" on Zalucki's hands.  Either one of
two different wounds was sufficient to cause death.  The ex-
pert testimony also established that Zalucki would have ex-
perienced pain from the wounds for a period of approx-
imately thirty minutes before losing consciousness.

The defendant did not contest the facts as to the homi-
cide, but instead relied on a defense of lack of criminal
responsibility.  He introduced evidence which outlined a
long history of mental illness, commencing in his early
teens, which continued up to the day of the crime.  The
Commonwealth did not dispute that the defendant suffered
from a mental illness at the time of the crime; rather it ques-
tioned the severity of the illness.[2]  Strangely, neither the
defendant nor the Commonwealth introduced expert medi-
cal testimony concerning the defendant's mental capacity at
the time of the crime, although the fact of the defendant's
various commitments to mental institutions was put before
the jury.

The defendant's twin brother Philip Louraine, testified
that his brother and he[3] held rather bizarre religious beliefs.
He testified that they believed that they were prophets of
God and had to defend themselves against demons.  Philip

---

[1] Number 23-B Van Buren Avenue was the address of a mental health
care facility for deinstitutionalized mentally ill persons.

[2] During its closing argument, the Commonwealth conceded that the
defendant had been mentally ill since the age of sixteen, but noted that it
was a matter of degree.

[3] The brother also testified that he was taking substantial doses of
medication to control his own schizophrenia.

recounted that the defendant had told him after the homicide that "Al [Zalucki] was the devil and that Al was going to hurt him, so he had to kill Al." Philip also testified that the defendant had reported experiencing hallucinations, had been committed to mental hospitals, had a history of ingesting drugs (including marihuana, lysergic acid diethylamide, and mescaline),[4] had acted in a strange and violent fashion on several occasions, and had attempted suicide several times.

Much of this testimony was corroborated by the testimony of the Reverend John A. Koonz, a Roman Catholic priest, Joel Louraine, the defendant's brother, and Peggy Louraine, the wife of a third brother. They confirmed Philip's testimony that the defendant had a long history of acting in a strange fashion and did hold bizarre religious beliefs, and that the defendant had suffered hallucinations and engaged in many violent episodes.

Hospital records concerning the defendant's admissions to Northampton State Hospital and other mental institutions were introduced. The Northampton records indicated that the defendant, at his own insistence, was admitted on January 24, 1979, after cutting his wrist with a razor blade. The records show that the defendant was experiencing "flashbacks" attributable to the ingestion of mescaline and that he was diagnosed as suffering from "[s]chizophrenia, chronic undifferential type." He was discharged on February 7, 1979. The defendant was readmitted on March 13, 1979, and a provisional diagnostic impression was entered that he was suffering from drug abuse. He was released the next day. The provisional diagnosis was changed to schizophrenia, but it was thought that there was no "need for [an] in-patient stay." He was released as an outpatient to the mental health care facility at 23-B Van Buren Avenue. A mental health assistant at Northampton State Hospital testi-

---

[4] During rebuttal, the witness Flebotte also testified that one week before the crime she had observed the defendant acting strangely after he had ingested mescaline.

fied that the defendant's mood shifted greatly during the periods when he was admitted to the hospital.

A registered nurse assigned to the Hampshire County jail, Joseph Leonczyk, also testified concerning the defendant's behavior between September 14 and September 28, 1979, while he was awaiting trial. He testified that the defendant appeared to be nervous and that his hands trembled. He recalled the defendant's telling him that "inner forces were bombarding his mind" and that he had suicidal thoughts.

1. *Involuntary medication of the defendant during trial.* There was no evidence that the defendant was taking any antipsychotic medication at the time of the homicide. The defendant argues that, since his mental capacity to commit the crime charged was at issue, the Commonwealth should not have been permitted to administer drugs, over his objection, which visibly affected his demeanor and mental processes at trial.[5] He asserts that he was deprived of the opportunity to place his true demeanor before the jury on the crucial issue of mental capacity and, as a consequence, was denied a fair trial.

The defendant filed a pretrial motion requesting that, if he were found competent, he be permitted to attend the trial in an unmedicated condition.[6] After a hearing, a motion judge of the Superior Court denied the motion and later entered written findings. He found that the defendant suffered from a mental illness known as chronic paranoid schizophrenia and that, while in custody, he was receiving antipsychotic medication in various forms and doses. These

---

[5] The defendant was held at Bridgewater State Hospital for most of the time from his arrest on May 26, 1979, until the trial. The motion judge found that at all times since his arrest he was given antipsychotic medications in various forms and various doses. Among the medications administered were prolixin, thorazine, mellaril, and trilafon. Elavil and artane, which are not antipsychotic medications, were also administered. The administration of antipsychotic drugs to the defendant continued during the trial.

[6] The defendant also requested that any competency examination occur while he was in an unmedicated condition.

doses had been increased gradually by State medical personnel and were considered to be "heavy." He found that the defendant's behavior and his symptoms of mental illness were "being controlled to some extent by the medication," but that the medication reduced the defendant's alertness and ability to concentrate. He also found that the defendant would not be competent to stand trial if the defendant did not receive medication.[7]

Evidence was offered at a competency hearing held one week before trial, which indicated that the defendant's condition remained unchanged.[8] After the hearing, the trial judge found that the defendant was psychotic and experienced psychotic episodes, during which he had "auditory and visual hallucinations" and "delusional and bizarre ideas." He also found that medication, while not eliminating the episodes, enabled the defendant "better to control himself and to cope with these episodes." Expert medical testimony at the pretrial hearing indicated that the defendant was then receiving "heavy" or "maximum" dosages of Stelazine, another antipsychotic medication.

We start with the proposition that few rights are more fundamental in our jurisprudence than that of an accused "to present . . . [his] version of the facts." *Washington* v. *Texas*, 388 U.S. 14, 19 (1967). This right is necessary to ensure that the defendant is not deprived of a fair trial. *Chambers* v. *Mississippi*, 410 U.S. 284, 302-303 (1973). This right is guaranteed not only by the Sixth and Fourteenth

---

[7] The motion judge ruled that the defendant was not entitled to be brought to trial in an unmedicated condition in order to present properly an insanity defense. He reasoned that the effects of the medication on the defendant could be brought to the attention of the jury through expert medical testimony. There was no such evidence offered either by the Commonwealth or by the defense.

[8] The defendant did not renew before the trial judge his motion that he be allowed to appear in an unmedicated condition. In these circumstances, we would usually examine only the record before the motion judge. *Commonwealth* v. *Cinelli*, 389 Mass. 197, 206 n.12 (1983). Because of our obligation under G. L. c. 278, § 33E, we examine the entire record.

Amendments to the Federal Constitution, but also by art. 12 of the Massachusetts Declaration of Rights. Article 12 provides that "every subject shall have a right to produce all proofs, that may be favorable to him." A defendant is entitled to place before the jury any evidence which is at all probative of his mental condition. *United States* v. *Hartfield,* 513 F.2d 254, 259-260 (9th Cir. 1975). See *United States* v. *Ives,* 609 F.2d 930, 932-933 (9th Cir. 1980). Thus, *"any and all conduct"* of the defendant is admissible in evidence. 2 J. Wigmore, Evidence § 228, at 9 (Chadbourn rev. 1979). The defendant's mental state both before and after the crime is admissible. *Id.* at § 233. Expert testimony is to be "unrestricted in stating all that is relevant to the defendant's mental illness." *Commonwealth* v. *Callahan,* 386 Mass. 784, 792 (1982), quoting *Commonwealth* v. *McHoul,* 352 Mass. 544, 550 (1967). See *Commonwealth* v. *Schulze,* 389 Mass. 735, 738-740 (1983).

Further, it is an established and universally accepted rule that, when the defendant's sanity is at issue, the trier of fact is entitled to consider the defendant's demeanor in court. *Commonwealth* v. *Devereaux,* 257 Mass. 391, 395 (1926). *State* v. *Hayes,* 118 N.H. 458, 462 (1978). *In re Pray,* 133 Vt. 253, 257-258 (1975). *State* v. *Maryott,* 6 Wash. App. 96, 101 (1971). Cf. *Commonwealth* v. *Clark,* 292 Mass. 409, 415 (1935). 4 J. Wigmore, Evidence § 1160 (Chadbourn rev. 1972). See *United States* v. *Chandler,* 72 F. Supp. 230, 238 (D. Mass. 1947). Thus, "[w]hen mental competence is at issue, the right to offer testimony involves more than mere verbalization," *State* v. *Maryott, supra* at 101, but includes the defendant's right to offer his demeanor in an unmedicated state. *Id.* at 101-103. *In re Pray, supra* (dictum). See *State* v. *Hayes, supra* at 462. See also *State* v. *Murphy,* 56 Wash. 2d 761, 766-767 (1960).

In a case where an insanity defense is raised, the jury are likely to assess the weight of the various pieces of evidence before them with reference to the defendant's demeanor. Further, if the defendant appears calm and controlled at trial, the jury may well discount any testimony that the de-

fendant lacked, at the time of the crime, substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. See *Commonwealth* v. *McHoul, supra* at 546-547. This tendency may render also valueless the defendant's right to testify on his own behalf. See *In re Pray, supra; State* v. *Murphy, supra* at 766-767.

The ability to present expert testimony describing the effect of medication on the defendant is not an adequate substitute. At best, such testimony would serve only to mitigate the unfair prejudice which may accrue to the defendant as a consequence of his controlled outward appearance. It cannot compensate for the positive value to the defendant's case of his own demeanor in an unmedicated condition. Moreover, "[i]f the state may administer tranquilizers to a defendant who objects, the state then is, in effect, permitted to determine what the jury will see or not see of the defendant's case by medically altering the attitude, appearance and demeanor of the defendant, when they are relevant to the jury's consideration of his mental condition." *State* v. *Maryott, supra* at 102.

Proper respect for the role of the jury as "the sole judges of the credibility and weight of all of the evidence on the issue of insanity," *Commonwealth* v. *Kostka,* 370 Mass. 516, 536 (1976), quoting *Commonwealth* v. *Smith,* 357 Mass. 168, 178 (1970), also precludes the Commonwealth from forcing the defendant to appear at trial in a severely medicated condition. We have permitted the jury to exercise broad discretion in determining a defendant's sanity. We have held that expert testimony is not necessary to prove a defendant sane beyond a reasonable doubt, even in the face of uncontradicted expert testimony that a defendant was insane under the standards of *Commonwealth* v. *McHoul, supra,* at the time of the crime. *Commonwealth* v. *Brown,* 387 Mass. 220, 222-225 (1982). *Commonwealth* v. *Shelley,* 381 Mass. 340, 347 (1980). *Commonwealth* v. *Walker,* 370 Mass. 548, 582-583, cert. denied, 429 U.S. 943

(1976). *Commonwealth* v. *Kostka, supra* at 537-539.[9] The jury also may be instructed that they may infer that a defendant is sane from their knowledge gained from common experience that a great majority of people are sane and of the probability that any particular person is sane. *Commonwealth* v. *Brown, supra* at 221-222. *Commonwealth* v. *O'Brien,* 377 Mass. 772, 780 (1979). *Commonwealth* v. *Kostka, supra* at 525-537. These rules assume, however, that the defendant has had an adequate opportunity to present all relevant evidence on his behalf. Only where the defendant has had that opportunity can we fairly and confidently rely upon the ability of the jury to apply their common experience to judge the defendant's sanity.

The view we take is consistent with cases from other jurisdictions which have considered the precise question before us. In *State* v. *Maryott, supra* at 97, the court reversed the conviction where the defendant had been forced to take medication which visibly affected his demeanor during trial. The court emphasized the importance of the defendant's demeanor in an unmedicated state to the presentation of an insanity defense. *Id.* at 101-103.[10] In *State* v. *Hayes, supra* at 462, the court held that the defendant could be compelled to take medication only "if the jury is instructed about the facts relating to the defendant's use of medication and if at some time during the trial, assuming the defendant

---

[9] We note that the defendant in this case, like the defendant in *Kostka,* had a long history of mental illness. Although the defendant failed to put forth live expert testimony on the issue of mental responsibility, there was extensive evidence in the hospital records and from lay witnesses of the defendant's mental illness. Indeed, the Commonwealth conceded the fact of mental illness. In this context, the failure of the Commonwealth to offer expert testimony (despite the many psychiatric examinations of the defendant by court order) is inexplicable. See *Commonwealth* v. *Kostka, supra* at 539-540 (Hennessey, C.J., and Kaplan, J., dissenting).

[10] The decision in *State* v. *Maryott,* 6 Wash. App. 96 (1971), was based in part on the decision of the Washington Supreme Court in *State* v. *Murphy,* 56 Wash. 2d 761 (1960). In *Murphy,* the court granted a new trial because the defendant had been tried in a drugged condition. The court reasoned that the defendant's demeanor was relevant to the determination whether the death penalty should be imposed. *Id.* at 766-767.

so requests, the jury views him without medication for as long as he is found to have been without it at the time of the crime." In *In re Pray, supra,* the court reversed the conviction where the State had administered drugs to the defendant without fully disclosing to the defendant or his counsel what effect they had on the defendant. Chief Justice Barney, writing for the Vermont Supreme Court, stated that "[a]t the very least, [the jury] should have been informed that he was under heavy, sedative medication, that his behavior in their presence was strongly conditioned by drugs administered to him at the direction of the State, and that his defense of insanity was to be applied to a basic behavior pattern that was not the one they were observing. In fact, it may well have been necessary, in view of the critical nature of the issue, to expose the jury to the undrugged, unsedated Gary Pray, at least, insofar as safety and trial progress might permit." *Id.* at 257-258. These cases support the result we reach here.[11]

We do not suggest that "a new trial must be granted in every criminal case . . . where the appearance of the accused before the jury is marred by some mental, physical, or emotional impairment, regardless of the nature of the impairment, or the means by which it was brought about. Each case of this type must be decided on its own facts." *State* v. *Murphy,* 56 Wash. 2d 761, 768 (1960). See

---

[11] In *State* v. *Law,* 270 S.C. 664 (1978), the court held that the administration of psychotropic medication to the defendant during trial did not undermine his insanity defense. The case is distinguishable. Under South Carolina law, the defendant's sanity was judged by the M'Naghten test. *Id.* at 667. Under that test, the jury were asked to decide whether the defendant had the mental capacity to distinguish moral or legal right from moral or legal wrong, and to recognize the particular act charged as morally or legally wrong. *Id.* The test we have adopted is much broader and relieves the defendant of criminal responsibility if, at the time of the conduct, as a result of mental disease or defect, he lacked substantial capacity to conform his conduct to the requirements of the law. *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967). The defendant's demeanor is most relevant to this broader element of our test. Further, we adopted this broader test in part because it permitted a wider range of testimony to be received. *Id.* at 550.

*Commonwealth* v. *Nickerson,* 388 Mass. 246, 249-251 (1983). Cf. *Commonwealth* v. *Lombardi,* 378 Mass. 612, 616 (1979).[12] Thus, in some cases, the defendant's demeanor in an unmedicated condition will not be relevant.[13]

We turn to consider those issues which may arise at a new trial.

2. *Voluntariness of confession.* Prior to trial, a hearing was held before the trial judge to determine whether certain statements made by the defendant to the police at the time of his arrest should be suppressed. The defendant's motion sought to suppress his statement, made just before his arrest,

---

[12] In *Commonwealth* v. *Lombardi,* 378 Mass. 612, 616-617 (1979), we considered whether a defendant with amnesia could receive a fair trial. We said that "[w]here the amnesia is apparently permanent, the fairness of proceeding to trial must be assessed on the basis of the particular circumstances of the case. A variety of factors may be significant in determining whether the trial should proceed, including the nature of the crime, the extent to which the prosecution makes a full disclosure of its case and circumstances known to it, the degree to which the evidence establishes the defendant's guilt, the likelihood that an alibi or some other defense could be established but for the amnesia, and the extent and effect of the defendant's amnesia." A similar assessment of factors should occur in cases involving incompetency and insanity.

We note, however, that cases involving amnesia and insanity are not entirely equivalent. With amnesia, the potential for fraudulent claims is great. In contrast, this potential is minimal where the defendant, as is the case here, has a long history of mental illness and is being prescribed substantial doses of medication to enable him to control his illness. Further, the conduct of the Commonwealth is fundamentally different in the two types of cases. In cases involving incompetency and insanity, the Commonwealth is taking affirmative steps to bring the defendant to trial in an altered condition. See *State* v. *Maryott, supra* at 102.

[13] We note that we are not deciding today whether the Commonwealth may administer medication to criminal defendants involuntarily to ensure their competence to stand trial. See *Guardianship of Roe,* 383 Mass. 415, 432-455 (1981). The defendant has not argued that issue before us and, as a consequence, it has been waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Commonwealth* v. *Bertrand,* 385 Mass. 356, 358 (1982). We agree, however, with the Supreme Court of New Hampshire that if the defendant wishes to appear at trial in an unmedicated condition, even though medication might be necessary to maintain his mental competency, he may be held to have waived his right to be tried while competent. See *State* v. *Hayes,* 118 N.H. 458, 462 (1978), and authorities cited.

that he had stabbed the victim.[14]   While the motion and hearing focused on whether the defendant voluntarily and intelligently waived his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), the issue of voluntariness was raised by the motion.   The judge entered written findings and ruled that the statement that he had stabbed the victim constituted a spontaneous exclamation at a time when the defendant was neither in custody nor under suspicion and therefore was admissible even though the defendant had not been informed yet of his Miranda rights.

We believe that, in light of the evidence of insanity before him at trial, the trial judge also should have addressed the issue whether the statements given were the product of a rational intellect. *Commonwealth* v. *Cole*, 380 Mass. 30, 41 (1980).   *Commonwealth* v. *Chung*, 378 Mass. 451, 457 (1979).   *Commonwealth* v. *Johnston*, 373 Mass. 21, 24 (1977). *Commonwealth* v. *Harris*, 371 Mass. 462, 469-472 (1976).   The judge also had a duty to make or file specific findings on voluntariness with "unmistakable clarity." *Commonwealth* v. *Brady*, 380 Mass. 44, 52 (1980), quoting *Sims* v. *Georgia*, 385 U.S. 538, 544 (1967).   Our reading of the judge's findings leaves us unconvinced that he determined that the defendant's confession was voluntary.   He made no finding that the confession was the product of a rational intellect.   Neither the fact that the defendant made the confession spontaneously, *Commonwealth* v. *Chung*, *supra* at 456 n.5, nor the fact that he had not been taken yet in custody, *Commonwealth* v. *Johnston*, *supra*, is sufficient by itself to establish the voluntariness of the confession. At a new trial, the judge should conduct a voir dire on the voluntariness of the confession.   That hearing should focus on the defendant's sanity at the time of the confession.   *Commonwealth* v. *Chung*, *supra* at 457.   "Should the judge admit the confession, and if credible evidence of insanity at the time of the confession is presented to the jury, our practice

---

[14] The Commonwealth agreed not to introduce several statements made by Louraine after his arrest.

requires jury reconsideration as to the question of the defendant's rationality, likewise 'as part of the issue of voluntariness.'" *Id.*, quoting *Commonwealth* v. *Johnston, supra* at 25.

3. *Jury instructions.* We believe that, because of the trial tactics adopted by defense counsel, the judge did not deliver instructions concerning whether the jury could consider the defendant's drug use in deciding whether the murder was committed with deliberately premeditated malice aforethought or extreme atrocity or cruelty, *Commonwealth* v. *Gould,* 380 Mass. 672, 680-686 (1980), or concerning the relation between drug abuse and the *McHoul* standard. See *Commonwealth* v. *Sheehan,* 376 Mass. 765, 767-772 (1978). Defense counsel did not request such instructions and took the position that Louraine's acts could not have been the product of drug use.

In a case raising a defense of insanity, defense counsel is likely to be confronted with difficult decisions concerning trial tactics. Review under G. L. c. 278, § 33E, is not intended to relieve the defendant of the consequences of those decisions absent a substantial risk of a miscarriage of justice. At a new trial, the burden of requesting instructions in accordance with *Commonwealth* v. *Gould, supra,* and *Commonwealth* v. *Sheehan, supra,* will be on defense counsel. Provided that request is timely, the judge should deliver instructions in accordance with those opinions.[15]

4. *Insufficiency of the evidence concerning premeditation.* The defendant also argues that the conviction of mur-

---

[15] The defendant makes much of the fact that an expert witness for the Commonwealth testified on voir dire to the difficulty of distinguishing between drug use and mental illness as the cause of Louraine's acts. The record does not disclose why this expert never testified before the jury. We note, however, that defense counsel's posture at trial was that the acts were caused by Louraine's mental illness and not by drug use.

The defendant also claims error in that the judge submitted to the jury the issue whether the defendant suffered from a mental disease or defect at the time of the act even though the Commonwealth had conceded the point. The defendant did not raise the point below. In any case, we perceive no error.

der in the first degree should be reduced to murder in the second degree because of the insufficiency of the evidence concerning premeditation. The defendant did not object to those instructions which permitted the jury to convict the defendant of murder in the first degree on a theory of premeditation. Our review of the transcript reveals that there was sufficient evidence of premeditation produced during the Commonwealth's case-in-chief, assuming that the jury found the defendant to be legally sane.

*Judgment reversed.*

*Verdict set aside.*