[No. 14345-0-I.   Division One.   September 3, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. GEORGE LOVER, *Appellant.*

*Dori Jones* of *Washington Appellate Defender Association,* for appellant.

*Seth Dawson, Prosecuting Attorney,* and *S. Aaron Fine, Deputy,* for respondent.

RINGOLD, J.—George Lover appeals his conviction for second degree assault, assigning error to the court's order that he be medicated against his will, the failure to have a

bifurcated trial on self–defense and insanity, and to the finding that he made a knowing and intelligent waiver of the not guilty by reason of insanity (NGI) plea. We remand to permit Lover to enter an NGI plea.

Lover has been diagnosed as a paranoid schizophrenic, and was in the Monroe State Reformatory serving a sentence for robbery and drug possession. Lover was charged with second degree assault for hitting a prison guard, Dennis Martin, and breaking his jaw. Both Martin and Lover testified that Lover was upset because Martin ordered him to clean his cell and remove towels, which Lover used as rugs, from the floor of the cell. Lover testified that he believed Martin and an inmate were plotting against him. He said that he hit Martin because he was afraid Martin would do something to him first.

An independent expert, Dr. Robert Fink, was appointed to determine Lover's competency to stand trial. At the first competency hearing Dr. Fink testified that Lover spoke in an incomprehensible "word salad" and frequently did not respond to questioning. He concluded that Lover was not competent to stand trial and recommended that Lover be medicated to attain competency. Dr. Albert Bundt, a psychologist working at Monroe, testified that Lover could not assist in his own defense, had visual and auditory hallucinations, and would be competent only if medicated. The court found Lover to be incompetent and ordered him committed to Western State Hospital and medicated. Lover and his attorney objected to forcible medication, relying on *State v. Maryott*, 6 Wn. App. 96, 492 P.2d 239 (1971). At the second competency hearing a month later the parties stipulated that Lover was competent to stand trial. The State's motion that Lover continue to be medicated against his will to maintain competency was granted over defense objections.

At a later hearing the defendant moved for a bifurcated trial on the self–defense and NGI pleas. Defense counsel said Lover wanted a self–defense plea, but might be willing to plead NGI if the self–defense plea failed. The trial judge

ruled that Lover was not entitled to a bifurcated trial and denied the motion. Lover entered a plea of self–defense. At trial the jury was instructed on self–defense; Lover was found guilty and sentenced to 10 years in prison.

## COURT ORDERED MEDICATION

Lover first argues that *State v. Maryott, supra,* prohibits the involuntary administration of mind–altering drugs during trial because it affects the ability to appear and defend in person and violates due process. He contends his undrugged mental condition was relevant to his claim of self–defense because it was important that the jury consider the issue from the subjective viewpoint of the defendant. Lover argues that his attitude, appearance, and demeanor were important factors for the jury to consider, and that he did not appear the same at trial as he was at the time of the alleged assault because of the drugs.

In *Maryott,* the defendant was given chloral hydrate, librium, and sparine in dosages that affected "the thought, expression, manner and content of the person using the drugs." *Maryott,* at 97. Further, the drugs rendered the defendant "suspicious and uncommunicative" and hindered him from assisting in his defense. *Maryott,* at 97. The drugs were administered against the defendant's will and without a court order. This forcible medication was held to violate the defendant's fundamental right to be present at trial and to confront the witnesses against him as guaranteed by the due process clause and the sixth amendment to the United States Constitution, and by article 1, section 22 of the Washington State Constitution. *Maryott,* at 102–03. It also violated the defendant's fundamental due process right to be free to use his mental abilities at trial. *Maryott,* at 100.

▮ The right to be free from mind–controlling drugs is not absolute however:

"The safeguards that the constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of

violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." *Illinois v. Allen,* 397 U.S. 337, 347, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970) (concurring opinion).

*Maryott,* at 103. The *Maryott* court suggested that there must be a legitimate state interest in imposing drugs on a defendant who asks to be free of them. Further, "no control should be imposed until its need has been demonstrated [and] the control which is imposed should insure an orderly trial with the least interference with a defendant's rights." *Maryott,* at 103.

*Maryott* has been distinguished in later cases from other jurisdictions. In *State v. Jojola,* 89 N.M. 489, 553 P.2d 1296 (1976), the court found that thorazine did not adversely affect the defendant's thought process or the contents of his thoughts, rather it allowed the "cognitive part of the brain to come back into play." *Jojola,* at 492. Further, unlike *Maryott,* the drug enabled the defendant to confer with his attorney and aid in his own defense. Thus, *Maryott* was held to be inapplicable. *Jojola,* at 492.

*State v. Law,* 270 S.C. 664, 244 S.E.2d 302 (1978) also distinguished *Maryott,* finding that the psychotropic medicine administered to the defendant had positive effects. The court observed:

> While it is true the medications do affect cognitive and communicative processes, the effect is beneficial in that it enabled the appellant to effectively exercise the very rights he asserts he was denied. It is reasonable to conclude from the medical testimony that the medications enabled the appellant to assist counsel in an effective manner.

*Law,* at 671. The court concluded that

> medication may be administered without the consent of a defendant under compelling circumstances, including those where the medication is necessary to render a defendant competent to stand trial. We are of the opinion that such necessity would constitute a compelling state interest justifying infringement upon the right to bodily integrity.

*Law,* at 674.

*Maryott* is also distinguishable here. There was no court order in *Maryott* for the administration of drugs, and no finding that the drugs were necessary to help the defendant become competent to stand trial. The drugs given to Lover were administered pursuant to a court order after a hearing. The drugs in *Maryott* impaired the defendant's ability to aid at trial while the drugs given to Lover improved his ability to assist counsel and prepare a defense. The *Maryott* court found no compelling state interest for the administration of the drugs. The compelling interest here, as in *Law* and *Jojola,* is the State's interest in bringing an accused to trial, an interest the *Maryott* court recognized as "fundamental to a scheme of ordered liberty." *Maryott,* at 103. No less intrusive method of achieving this goal has been suggested by the defendant. Medication during the trial did not prevent Lover from appearing at trial and confronting witnesses, rather, it made it possible for him to do so.

Lover also relies in part on *State v. Murphy,* 56 Wn.2d 761, 355 P.2d 323, 83 A.L.R.2d 1061 (1960). *Murphy* is inapposite. The Washington Supreme Court found in *Murphy* that tranquilizers taken by the defendant without the knowledge of his attorney or of the State, impaired his emotional affect and demeanor and could have influenced the jury adversely. Because none knew the defendant was using the drugs, their influence could not be explained to the jury. Medication is allowable when, as here, the effect of the drugs and the defendant's typical behavior without the drugs can be fully explained to the jury. *State v. Gwaltney,* 77 Wn.2d 906, 468 P.2d 433 (1970).

## BIFURCATED TRIAL

Lover next contends that the trial judge erred in refusing to allow a bifurcated trial on self–defense and insanity. Lover's attorney, Kim Dupuis, asked the judge to rule on whether he would allow a bifurcated trial

if Mr. Lover indicates at this time his desire that his first preference is to plead innocent by reason of self–defense, to have an issue where we can present that defense to the jury and then wait the jury result of that. If he is found not guilty by reason of self–defense, that, of course, would end the prosecution. However, if he was found guilty of that, we would be requesting or moving the Court at that time, depending on Mr. Lover's feelings at that time, to possibly to have a second trial to deal with the issue of insanity.

. . .
The problem that we could have would be that Mr. Lover may, even after a trial on the issue of self–defense, still not desire to go to a trial on the insanity issue. And it appears . . . that that's certainly his right to do that. But it's also possible, in my feeling, that if he was to go and lose on the self–defense, that he may desire to proceed with the insanity.

Dupuis further argued that Lover had two pleas that were incompatible and should not be forced into choosing a single defense.

■ Lover's reliance on *State v. Jones,* 32 Wn. App. 359, 647 P.2d 1039 (1982), *rev'd on other grounds,* 99 Wn.2d 735, 664 P.2d 1216 (1983) in asserting that the court erred in failing to exercise its discretion and consider the necessity of a bifurcated trial is misplaced. In *Jones,* the defendant actually entered pleas of self–defense and insanity. Lover did not enter dual pleas. Dupuis admitted that Lover did not want to plead NGI because he did not believe he was insane, but hoped that Lover might change his mind if the judge authorized a bifurcated trial. Lover testified that he wanted to plead "Innocent and innocent to protect myself," and that he was not insane and did not want an insanity defense. Lover was essentially trying to have "two bites at the apple," not a bifurcated trial following the entry of two pleas. Because Lover did not enter the two pleas, the trial court correctly denied the motion for a bifurcated trial.

## WAIVER OF NGI PLEA
The final issue is whether Lover knowingly and intelli-

gently waived his right to plead NGI. Lover argues that his testimony at the pretrial hearing demonstrates that he did not understand the consequences of waiving the plea or the distinction between guilty and not guilty pleas. Additionally, Lover contends the court erred in failing to hold another competency hearing after the CrR 3.5 hearing.

Lover's attorney questioned him closely on his knowledge and understanding of the two pleas and the possible consequences of losing on the self–defense plea. Lover's answers were frequently nonresponsive or only partially coherent. For example, when asked "What would happen if we went to court and pleaded insanity? What do you think would happen, Skip?", Lover replied:

> I'd feel neglected because I'm not insane, because the word insane goes with sane. It's I–N–S–A–N–E, then sane is S–A–N–E, and here the other derivative to it. Solitude is solitary. That just goes to show you I'm not insane. I want to make sure I'm competent to be understood. Can you understand that, Judge?

Lover responded appropriately to "yes or no" questions, but he never gave a correct and coherent discursive answer. For example:

> Q. . . . remember when we talked about pleading not guilty by reason of insanity and that if you pled not guilty by reason of insanity that meant that they would move you from the Monroe Reformatory down to Western State Hospital?
>
> A. Yes, And that, Your Honor, I never would be able to explain it, because it already happened to me, but medicine—the medicine—I mean, this is just half of me. If I wasn't on medicine you would really understand my whole thorough outlook. You see, what I'm saying, even though some of the words I use are big words, but—my min man (phonetic) background, I've been to school, went through the eleventh grade, through the twelfth, I went to college, I got trophies.

After Dupuis finished questioning Lover, the judge asked a short series of "yes or no" questions relating primarily to the voluntary nature of the plea.

■ A defendant must be capable of making, and must

make, an intelligent and voluntary decision to waive the NGI plea. *State v. Jones,* 99 Wn.2d 735, 745, 644 P.2d 1216 (1983).

> This requires the trial judge to "conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the [insanity] defense, and freely chooses to raise or waive the defense."

*Jones,* at 745 (quoting *Frendak v. United States,* 408 A.2d 364, 380 (D.C. 1979)).

The test for waiver of an NGI plea was set out in *Jones:*

> [T]he only permissible inquiries when a defendant seeks to waive his insanity defense are whether he is competent to stand trial and whether his decision is intelligent and voluntary. . . . If the court finds that the defendant is competent to stand trial but that his decision to forgo an NGI plea is not intelligent and voluntary, it should provide him with whatever additional information or assurances are necessary to enable such a decision. In only the rarest of cases, if ever, will it be impossible to make the decision intelligent and voluntary and hence be necessary to enter an NGI plea sua sponte.

(Footnotes omitted.) *Jones,* at 746–47. The court rejected the idea that the refusal to recognize his or her insanity might prevent a defendant from making a rational decision, stating that "We see no reason . . . why this would prevent a competent defendant from understanding that, despite his own belief, a jury might find him insane." *Jones,* at 747 n.4.

The question of knowing and intelligent waiver more frequently arises in cases involving the right to counsel. Generally, the "question ultimately is the *subjective* understanding of the accused rather than the quality or content of the explanation provided". *State v. Chavis,* 31 Wn. App. 784, 790, 644 P.2d 1202 (1982); *see also State v. Imus,* 37 Wn. App. 170, 173, 679 P.2d 376, *review denied,* 101 Wn.2d 1016 (1984); *State v. Brasel,* 28 Wn. App. 303, 623 P.2d 696 (1981). The trial judge "should question the accused in a manner designed to reveal *understanding*

rather than framing questions that call for a simple 'yes' or 'no' response." *Chavis,* at 790.

While the record establishes that Lover was informed of his options and of the consequences of waiving the plea, it is not clear that Lover actually *understood* what he was told. The judge apparently concerned himself primarily with the voluntary nature of the plea, rather than with whether it was knowing and intelligent. Based on Lover's disjointed, incoherent responses, the absence of any indication that he understood the significance of waiving the plea, and the "yes or no" form of many of the questions asked by the court, we find that the record does not adequately establish that the waiver of the NGI plea was knowing and intelligent.[1]

The State argued on cross appeal that Lover was not entitled to self–defense instructions. It is unnecessary to consider this issue on appeal because Lover does not assign error to any aspect of the self–defense trial and is not entitled to a new trial on a self–defense theory. The cause is remanded for a new plea on the NGI defense only. If Lover decides to enter an NGI plea, he is entitled to a trial on that plea. A finding of NGI by the jury would void the earlier conviction, rejection of the NGI defense would leave the earlier verdict standing.

The cause is remanded for further proceedings in accordance with this opinion.

SWANSON and GROSSE, JJ., concur.

---

[1] Our decision here is not intended as criticism of the trial judge who dealt with this problematic issue. We recognize the difficulty inherent in safeguarding both the defendant's right to control his defense and the right to a fair trial, and commend the trial judge on his effort to give the defendant an opportunity to choose his plea. The law is developing in this area and criteria are not firmly established.